IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                     No. CR 21-0655 JB

JESSE BURKE,

       Defendant.

**MEMORANDUM OPINION AND ORDER**[1]

**THIS MATTER** comes before the Court on the Unopposed Motion for Compassionate Release, filed February 23, 2024 (Doc. 157)("Motion"). The Court held a hearing on April 10, 2024. See Clerk's Minutes at 1, filed April 10, 2024 (Doc. 165). The primary issues are: (i) whether Defendant Jesse Burke has exhausted his administrative remedies; (ii) whether Burke's ████████████████████████████████████████████████ medical issues constitute extraordinary and compelling reasons warranting his release; (iii) whether a reduction in Burke's sentence is consistent with applicable policy statements from the United States Sentencing Commission ("Sentencing Commission"); and (iv) whether a sentence reduction aligns with the applicable 18 U.S.C. § 3553(a) factors. The Court concludes that: (i) Burke has exhausted his administrative remedies, because Lynne B. Kelly, the FCI Butner warden, has not replied to

---

[1]In its Sealed Memorandum Opinion and Order, filed July 12, 2024 (Doc. 170)("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to protect confidential information within the Sealed MOO before the Court published a public version of the Sealed MOO. See Sealed MOO at 1 n.1. In response to the Court's request, Defendant Jesse Burke proposes that the Court redact portions of the Sealed MOO. See Defendant's Proposed Redactions as to Sealed Memorandum Opinion and Order, filed August 7, 2024 (Doc. 172). This public version of the Sealed MOO is the redacted version of the Sealed MOO. The Court has made no other changes to the public document other than the redactions.

Burke's request for compassionate release, despite that more than thirty days have elapsed since Burke made his request; (ii) Burke's ███████████████████████ medical condition present extraordinary and compelling reasons warranting his compassionate release under 18 U.S.C. § 3582(c)(1)(A); (iii) a reduction in Burke's sentence is consistent with applicable United States Sentencing Guideline Manual (U.S. Sent'g Comm'n 2023)("U.S.S.G.") policy statements; and (iv) the 18 U.S.C. § 3553(a) factors do not support Burke's release, because a time-served sentence is not sufficient to reflect the seriousness of his offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from Burke, and to provide Burke with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Accordingly, the Court denies the Motion.

## FINDINGS OF FACT

The Court takes its facts from: (i) the Motion; (ii) the Presentence Investigative Report, filed March 23, 2022 (Doc. 78)("PSR"); (iii) the Plea Agreement, filed January 18, 2022 (Doc. 71)("Plea Agreement"); (iv) the Dr. Stephen R. Smith Medical Opinion (dated November 16, 2023), filed February 23, 2024 (Doc. 157-1)("Smith Medical Opinion"); and (v) the Medical Records Excerpt, filed February 23, 2024 (Doc. 158-1)("Medical Records"). The Court first describes Burke's previous criminal history. Second, the Court discusses Burke's offense of conviction. Third, the Court outlines Burke's medical conditions. Fourth, the Court describes Burke's time in prison and his plan should he be released. Last, the Court describes Burke's medical developments since the Court held a hearing on his Motion.

1.      **Burke's Criminal History**.

1.      Burke has seven prior State court criminal convictions.  See PSR ¶¶ 42-48, at 8-13.

2.      On November 9, 2000, Burke was convicted in New Mexico State court of Possession of Marijuana when officers conducting a welfare check at Burke's residence discovered "approximately 15.4 ounces of marijuana, six marijuana plants, one lighter, four pipes, and two scales" in Burke's bedroom.  PSR ¶ 42, at 8-9.

3.      On December 13, 2004, Burke was convicted in New Mexico State court of Possession of a Controlled Substance after he "intentionally possess[ed] methamphetamine." PSR ¶ 43, at 9-10.

4.      Also on December 13, 2004, Burke was convicted in New Mexico State court of Possession of a Controlled Substance and Possession of Drug Paraphernalia after police "located several pipes, a baggie of marijuana, a small bottle of methamphetamine, two knives, a bong, rolling papers, several lighters, a butane torch, and a scale" in Burke's possession.  PSR ¶ 44, at 10.

5.      On January 2, 2007, Burke was convicted in Arizona State court of Possession of Marijuana for Sale after police discovered a marijuana plant growing in Burke's yard and a pipe and two marijuana cigarettes on his person.  See PSR ¶ 45, at 10-11.

6.      On March 29, 2011, Burke was convicted in Arizona State court of Dangerous Drug Possession after officers located marijuana, methamphetamine, prescription pills, a syringe, a pipe, a digital scale, razor blades, and "various other drug paraphernalia items" in Burke's vehicle and on Burke's person during a traffic stop.  PSR ¶ 46, at 11-12.

7.     On September 11, 2014, Burke was convicted in New Mexico State court of Possession of a Controlled Substance and Use or Possession of Drug Paraphernalia after officers discovered Burke in possession of "approximately 0.2 grams of marijuana and 1.7 grams of methamphetamine." PSR ¶ 47, at 12.

8.     Also on September 11, 2014, Burke was convicted in New Mexico State Court of an additional count of Possession of a Controlled Substance in relation to a separate incident during which police officers discovered Burke in possession of "a glass pipe," and of "Amphetamine and Dextroamphetamine, (a common ADHD medication)" in a vehicle in which Burke was a passenger. PSR ¶ 48, at 12-13.

9.     In addition to his criminal convictions, Burke has been arrested eight times, but, for each arrest, the charges against Burke have been dismissed or it was otherwise determined that Burke would not be prosecuted. See PSR ¶¶ 53-60, 14-16.

10.     Burke was arrested on four separate occasions for drug possession. See PSR ¶¶ 54, 56-58, at 14-15.

11.     Burke also has prior arrests for Shoplifting, after he attempted to steal from a store a necklace and an MP3 player, but subsequently returned the items, see PSR ¶ 55, at 14, and for Unlawful Taking of a Motor Vehicle, after he drove a truck off a dealership lot, see PSR ¶ 53, at 14.

12.     On October 15, 2020, Burke was arrested for Aggravated Battery Against a Household Member when "authorities were dispatched in reference to a physical disturbance between the victim, identified as A.S., and the defendant." PSR ¶ 59, at 15.

13.     At the time of the incident, Burke informed officers that he had only a verbal argument with A.S., but A.S. informed officers that Burke "grabbed her by the throat and began to choke her," and "[o]fficers noted that there were red marks on A.S.' throat."  PSR ¶ 59, at 16.

14.     On June 7, 2021, Burke was arrested for Receipt, Transportation or Possession of a Firearm or Destructive Device by Certain Persons after "officers located . . . an AR15 assault rifle, and plastic wrapped items consistent with packaged illegal narcotics" in Burke's vehicle, and "a large area of methamphetamine crystals on the floor" of the hotel room in which Burke was staying.  PSR ¶ 60, at 16.

15.     During the execution of a search warrant of Burke's vehicle on June 14, 2021, officers found, in addition to the narcotics and AR15 assault rifle, ammunition, a digital scale, "a plastic bag containing 9 grams of magic mushrooms, numerous glass pipes and bong devices, several containers of marijuana products, and packaging material."  PSR ¶ 60, at 16.

16.     In relation to his State convictions, Burke has previously had probation revoked and been unsatisfactorily discharged from probation.  See PSR ¶¶ 42-46, at 8-11.

17.     Burke "has previously used illicit substances while on" supervised release.  See PSR ¶ 70, at 18-19.

**2.      The Underlying Offense.**

18.     In August, 2019, law enforcement in Cibola County, New Mexico, obtained information pursuant to a search warrant from a confidential source, who "provided information in exchange for consideration on a drug-related state charge in New Mexico," that Burke was engaging in "drug trafficking behavior."   PSR ¶ 10, at 3-4.

19.     The confidential source provided information "that Burke was regularly obtaining around 10 pounds of methamphetamine per week . . . ."  PSR ¶ 12, at 4.

20.     On November 4, 2020, Grants Police Department were conducting surveillance on Burke in Grants, New Mexico, when they followed Burke in his vehicle to a Holiday Inn Express Hotel.  See PSR ¶ 13, at 4.

21.     Grants Police officers observed the arrival of a second vehicle, which parked close to Burke's vehicle, and, shortly thereafter, Burke emerged from his vehicle carrying a black and blue gym bag and entered the hotel.  See PSR ¶ 13, at 4.

22.     "Approximately 50 minutes later, Burke was seen exiting the hotel with an unknown Hispanic male, later identified as Sergio Carballo."  PSR ¶ 13, at 4.

23.     Burke carried the same black and blue gym bag officers had observed him carrying when he entered the hotel, and Carballo carried a black backpack, both of which were placed into Burke's vehicle.  See PSR ¶ 13, at 4.

24.     "Burke then got into the driver's seat and Carballo in the passenger seat, and they drove away from the hotel . . . ."  PSR ¶ 13, at 4.

25.     Grant's Police officers and Drug Enforcement Administration ("DEA") agents who were also present followed Burke's vehicle, and conducted a traffic stop after the vehicle failed to use a turn signal.   See PSR ¶ 14, at 4; Plea Agreement ¶ 9(a), at 4.

26.     While speaking with Burke and Carballo, who was identified as the vehicle's passenger, DEA "agents noted the smell of marijuana emitting from the vehicle," and "Burke then provided agents with a valid medical marijuana card," although he advised DEA agents that "he had not smoked on this day."  PSR ¶ 14, at 4.

27.     DEA agents determined that Burke "possessed a legal amount of marijuana," and he was released from the scene and "given a warning for the traffic violation"; however, DEA agents "seized Burke's vehicle due to the suspicion of narcotics while waiting for a search warrant."  PSR ¶ 16, at 5.

28.     On November 23, 2020, DEA agents executed the federal search warrant on Burke's vehicle and discovered, in the gym bag which Burke had been observed carrying in and out of the Holiday Inn Express Hotel, "[t]wo bags containing approximately 1,415.2 grams of a crystal-like substance that was field tested and yielded a positive result for methamphetamine," and a digital scale.  PSR ¶ 21, at 6.  See Plea Agreement ¶ 9(a), at 4.

29.     Burke possessed the methamphetamine discovered in the black and blue gym bag and intended to distribute it to others.  See Plea Agreement ¶ 9(a), at 4.

30.     In the black backpack which Carballo wore out of the Holiday Inn Express Hotel, DEA agents located $3,980.00, "[t]wo bags containing approximately 36.28 grams of a crystal-like substance that was field tested and yielded a positive result for methamphetamine," and "3 white pills believed to be hydrocodone."  PSR ¶ 22, at 6.

31.     On May 12, 2021, a federal Grand Jury indicted Burke and Carballo each on a single count of Possession with Intent to Distribute 50 Grams and More of Methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).  See Indictment at 1, filed May 12, 2021 (Doc. 2).

32.     Burke was not on probation, parole, or any other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law at the time he

committed his underlying offense.   See PSR ¶¶ 48, at 12-13 (indicating that Burke was "satisfactorily discharged from probation" for his most recent conviction in 2017).

33.     On January 8, 2022, Burke plead guilty to one count of "Possession with Intent to Distribute 5 Grams and More of Methamphetamine."  Plea Agreement ¶¶ 8, 24, at 3-4, 10.

34.     Based on Burke's total offense level of 31 and his criminal history category of V, the PSR calculates Burke's guideline imprisonment range at 168-210 months.  See PSR ¶ 82, at 21.

35.     As part of Burke's Plea Agreement, the parties agreed that "a specific sentence of 60 months' imprisonment is the appropriate disposition in this case."  Plea Agreement ¶ 11(a), at 5.

36.     Sixty months is the mandatory minimum sentence for Burke's offense.  See 21 U.S.C. § 841(b)(1)(B).

37.     At Burke's April 25, 2022, sentencing hearing, see Sentencing Minute Sheet, filed April 25, 2022 (Doc. 94), the Court requested that the parties justify the "significant variance . . . built into the plea agreement," Transcript of April 25, 2022, Hearing at 4:6-7 (taken April 25, 2022)("Sentencing Tr.")(Court).[2]

38.     Burke responded by identifying that Burke's criminal history is non-violent and almost entirely the result of his "addiction to methamphetamine," Sentencing Tr. at 4:17-5:5 (Johnson), and that Burke became involved in the drug trafficking activity which resulted in his

---

[2]The Court's citations to the draft transcript of the hearing refers to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

underlying offense, "because that was an easy way for him to obtain his high demand of personal use [of] methamphetamine," Sentencing Tr. at 5:2-4 (Johnson).

39.     Burke also explained that he "is a very ill individual," because 

Sentencing Tr. at 5:6-9 (Johnson).  See id. at 6:3-5 (Johnson)(describing that Burke also

40.     Burke stated that "the parties believe that the 60 month[s is] appropriate, and would be a just and fair sentence, particularly given the fact that Mr. Burke has these very advanced health issues . . . .  So five years could potentially be a life sentence for someone like Mr. Burke." Sentencing Tr. at 7:9-14 (Johnson).

41.     The United States explained that its agreement to the variance in Burke's sentence was based in part on the "litigation risk associated with the motion to suppress in this case" surrounding the seizure of Burke's vehicle, which the United States described as involving a "chaotic scene" in which "the officers on the ground . . . didn't necessarily follow the play book . . . ."  Sentencing Tr. at 9:15-10:14 (Matthews).

42.     The United States also agreed that "Burke's substance abuse issues,                     and his ongoing health issues" also support a variance.  Sentencing Tr. at 11:14-16 (Matthews).

43.     The Court accepted the Plea Agreement, see Sentencing Tr. at 12:17-22 (Court), and sentenced Burke to 60 months in custody, see Judgment in a Criminal Case at 2, filed May 31, 2022 (Doc. 97).

44.     The Court recommended that Burke "participate in the Bureau of Prisons 500-hour drug and alcohol treatment program" while in custody.  Sentencing Tr. at 14:12-14 (Court).

**3.     Burke's Medical Conditions.**

45.     At the time of sentencing, Burke had been diagnosed with ██████████████

████████████████████████████████████████████████████████████████

████    See PSR ¶ 67, at 18.

46.     Burke's "primary medical condition is ████████████████████████

██████████████████████████████████████ Smith Medical Opinion at 2.

**a.     Stage 5 Chronic Kidney Disease.**

47.     "CKD is a condition in which the kidneys are damaged and cannot filter blood as well as they should.  Because of this, excess fluid and waste from blood remain in the body and may cause other health problems, such as heart disease and stroke."  Chronic Kidney Disease Basics, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/kidneydisease/basics.html (last visited June 15, 2024)("Chronic Kidney Disease Basics").

48.     "Chronic kidney disease is a common complication and concomitant condition of diabetes," and "[c]hronic kidney disease in type 1 diabetes patients typically can cause a progressive decline in renal function."  Espen Nordheim & Trond Geir Jenssen, Chronic Kidney Disease in Patients with Diabetes Mellitus, 10 Endocrine Connections 151, 151 (2021)("Nordheim and Geir").  See Smith Medical Opinion at 2 (explaining that CKD involves the "progressive decline in the waste removal function of the kidneys").

- 10 -

49.     CKD "usually gets worse over time though treatment has been shown to slow progression," and "can progress to kidney failure and early cardiovascular disease."  Chronic Kidney Disease Basics.

50.     When CKD causes the kidneys to stop working, a condition known as end-stage renal disease, "dialysis or kidney transplant is needed for survival."  Chronic Kidney Disease Basics.

51.     "Kidney transplantation is the treatment of choice for end-stage renal disease." Josefina Santos & La Salete Martins, Estimating Glomerular Filtration Rate in Kidney Transplantation: Still Searching for the Best Marker, 4 World J. Nephrology 345, 345 (2015).  See Smith Medical Opinion at 2 ███████████████████████████████████████ ██████████████████████████████

52.     ██████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████ Muhammad F. Hashmi, Onecia Benjamin, & Sarah L. Lappin, End-Stage Renal Disease 3 (2023)("Stage 5: Renal failure (GFR less than 15 mL/min)"); Stage 5 Chronic Kidney Disease (CKD), American Kidney Fund, https://www.kidneyfund.org/all-about-kidneys/stages-kidney-disease/stage-5-chronic-kidney-disease-ckd (last visited June 15, 2024) ("Stage 5 CKD")("In Stage 5 CKD, you have an eGFR of less than 15.").

53.     Stage 5 is the final stage of CKD, and means the "kidneys are getting very close to failure or have already failed," and "are severely damaged and have stopped doing their job to filter waste from your blood."  Stage 5 CKD.

54.     "[E]valuation for possible transplantation . . . is usually done when the estimated GFR of 20 ml/min is reached."  Smith Medical Opinion at 2.  See Ana P. Rossi & Xingxing Shelley Cheng, Kidney Transplantation in Adults: Evaluation of the Potential Kidney Transplant Recipient, UpToDate (January 17, 2024)(noting that patients should be referred to a transplantation program when their GFR is less than 30 ml/min).

55.     Although the BOP provides a procedure by which inmates may be evaluated for and eventually receive a kidney transplant, because of the onerous nature of this process and "a restriction placed by transplant centers," Burke cannot "be evaluated for kidney transplantation while incarcerated . . . ."  Smith Medical Opinion at 2.  See Motion at 8-9 (citing Fed. Bureau of Prisons, U.S. Dep't of Just., Program Statement No. 6031.04, Patient Care at 45-46, https://www.bop.gov/policy/progstat/6031_004.pdf ("Patient Care Program Statement")(outlining the multi-step process inmates must undertake to receive an organ transplant); Matthew Murphy et al., Kidney Disease Among People Who Are Incarcerated, 16 Clinical J. Am. Soc. Nephrology 1766, 1768 (2021)("Many programs preclude prisoners from consideration for transplantation because of the logistical hurdles to bringing prisoners to hospitals on short notice and getting laboratory results rapidly.").

56.     To receive a kidney transplant, a potential non-incarcerated recipient must undergo a health evaluation and register on the national transplant waiting list, which is managed by the United Network for Organ Sharing ("UNOS").  See Darren Stewart, Tatenda Mupfudze & David

Klassen, <u>Does Anybody Really Know What (The Kidney Median Waiting) Time Is?</u>, 23 Am. J. Transplantation 223, 223 (2023).

57.     Once an individual is listed on the national transplant waiting list, the average wait time for a kidney transplantation is around four years.  <u>See</u> Stewart et al., <u>supra</u>, at 223.

58.     Wait times can vary by region, and New Mexico, as with more rural areas in the United States generally, tends to have slightly longer wait times than the national average.  <u>See</u> Ashley E. Davis et al., <u>The Extent and Predictors of Waiting Time Geographic Disparity in Kidney Transplantation in the United States</u>, 97 Transplantation 1049, 1051 (2014); United States Renal Data System, <u>End Stage Renal Disease, Chapter 7: Transplantation</u>, <u>in</u> <u>2023 USRDS Annual Data Report: Epidemiology of kidney disease in the United States</u>, 15 (2023)("Transplantation ADR").

59.     "White and Asian patients" generally have "the highest rates of kidney transplantation, followed by Hispanic patients; Black, Native American, and Native Hawaiian/Pacific Islander patients" generally have "lower rates."  Transplantation ADR at 1, 14.

60.     For individuals entering the national transplant waiting list in 2016, "[b]y the end of 5 years, nearly half (46.3%) had received a transplant, whereas 18.5% had died." Transplantation ADR at 9.

61.     For individuals receiving dialysis, an average of ten percent die within three years of entering the national transplant waiting list, while forty-five percent had received a kidney transplant.  <u>See</u> Transplantation ADR at 11.

62.     "Dialysis is typically initiated when a patient's GFR range is between 7-15 ml/min."   Smith Medical Opinion at 2.   <u>See</u> <u>Dialysis</u>, National Kidney Foundation, www.kidney.org/atoz/content/dialysisinfo.

- 13 -

63.    The BOP offers dialysis treatment to inmates at seven Federal Medical Centers. See Bureau of Prisons Assessment of Health Care Reentry Policies and Procedures Needed 8, United States Government Accountability Office (2023)("BOP also operates seven Federal Medical Centers to provide more advanced health services to inmates with end-stage disease states, such as those requiring dialysis or cancer treatment.").

64.    The most effective way to undergo dialysis is through the insertion of a fistula, which is a surgical "connection that's made between an artery and a vein for dialysis access," but "[i]f immediate dialysis is required, a dialysis catheter can be inserted in a vein until a longer-term solution is created."    Preparing for Dialysis (AV Fistula), Yale Medicine, www.yalemedicine.org/conditions/preparing-dialysis-av-fistula (last visited June 20, 2024)("The longest-lasting and best type of dialysis access is an arteriovenous fistula, or AV fistula.").

65.    ███████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████

66.    If not properly addressed the buildup of waste and toxins in the kidneys associated with Stage 5 CKD, becomes "life-threatening."    See Stages of Chronic Kidney Disease, Healthline, www.healthline.com/health/ckd-stages.

67.   ████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

68.   Burke's ████████████ "end-stage organ disease," is "a serious and advanced illness with an end-of-life trajectory" that constitutes a "terminal illness" under the Sentencing Commission's U.S.S.G. § 1B1.13 policy statement.  U.S.S.G. § 1B1.13(b)(1)(A).

**b.**   **Celiac Disease and Gastroesophageal Reflux Disease.**

69.   ████████████████████████████████████████

██████  █████████████████████████████ See id. at 14 (explaining that gastroesophageal reflux disease, "a more advanced form of acid reflux characterized by 'frequent or severe symptoms or injury,'" ██████████████████████ (quoting Gastroesophageal Reflux Disease (GERD), Johns Hopkins Med., www.hopkinsmedicine.org/health/conditions-and-diseases/gastroesophageal-reflux-disease-gerd)).

70.   "Without a gluten-free diet, people with celiac disease can develop anemia, multiple sclerosis (MS), epilepsy, heart disease, and intestinal cancer."  Motion at 13 (citing What Is Celiac Disease?, Celiac Disease Foundation, www.celiac.org/about-celiac-disease/what-is-celiac-disease).

71.   ████████████████████████████████████████

█████████████████████████████████████

c.   **Type 1 Diabetes**.

72.   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

73.   Type 1 diabetes is characterized by the inability of a patients' kidney to produce insulin, and a "[l]ack of insulin can cause fluctuations in blood glucose."  Motion at 10.  See What is Type 1 Diabetes?, Centers for Disease Control and Prevention, www.cdc.gov/diabetes/basics/what-is-type-1-diabetes.html (last visited June 20, 2024).

74.   For those with Type 1 diabetes, "'[u]nusually high or low blood glucose levels can potentially lead to acute and or chronic, life-threatening conditions."  Motion at 10.

75.   Blood glucose levels that are too high, a condition known as hyperglycemia, can cause "blindness, nerve damage and kidney damage.'"  Motion at 10 (quoting Thomas K. Mathew & Prasanna Tadi, Blood Glucose Monitoring, Nat'l Ctr. Biotechnology Info., www.ncbi.nlm.nih.gov/books/NBK555976).

76.   To prevent dangerous "spikes" in blood glucose levels, "people with Type 1 diabetes must have regular access to insulin injections," ████████████████████████████ ██████████████   Motion at 10 (citing Diabetes Treatment: Using Insulin to Manage Blood Sugar, Mayo Clinic, www.mayoclinic.org/diseases-conditions/diabetes/in-depth/diabetes-treatment/art-20044084).  See Daniel L. Lorber et al., Diabetes Management in Detention Facilities: A Statement of the American Diabetes Association, 47 Diabetes Care 544, 548 (March 25, 2024)("Diabetes Management Statement")("All people with type 1 diabetes require daily treatment with insulin and glucose monitoring to adjust insulin dosing.")

- 16 -

77. ██████████████████████████████████████████████

██████████████████████████████

78. ██████████████████████████████████████████████

██████████████████████

79.     Some of the insulin ███████████████ is "known as 'mealtime insulin' and is designed specifically to be taken before meals so that he can regulate his blood sugar levels throughout the day."  Motion at 11 (no citation given for quotation).

80.     Because the BOP has not provided Burke with gluten-free food that he can eat, "Burke is sometimes forced to choose between taking insulin for his diabetes but then throwing up his food due to the celiac disease, and not taking the insulin, not eating, and then hoping his blood sugar can remain stable."  Motion at 14.

81.     For individuals like Burke, who take "rapid-acting premeal insulin," the American Diabetes Association advises that "meal and snack timings should be coordinated with medication schedules to reduce hypoglycemia risks."  Diabetes Management Statement at 547.

82.     In addition to preventing hyperglycemia -- the result of blood glucose levels that are too high -- an individual with Type 1 diabetes must also be cautious to ensure that his or her blood glucose levels do not drop too low, a condition "known as hypoglycemia," Motion at 11, which, if left untreated, can lead to seizure, coma, and death, see Hypoglycemia, Mayo Clinic, www.mayoclinic.org/diseases-conditions/hypoglycemia/symptoms-causes/syc-20373685 (last visited June 20, 2024).

83.     To prevent hypoglycemia, "people with diabetes must consume additional food, especially sugary foods, sugary drinks, or glucose tablets."  Motion at 11.  See Diabetes

Management Statement at 547 ("For those on insulin or hypoglycemia-inducing oral agents, the availability of snacks, especially those containing fast-acting carbohydrates, is essential to avoid and treat hypoglycemia.").

84.    For individuals at risk of hypoglycemia, "[e]nsuring uninterrupted commissary access is vital, as swift intake of fast-acting carbohydrates can avert severe consequences like seizures or coma." Diabetes Management Statement at 547.

85.    During the time that Burke was at FCI Butner, a several-month-long kitchen closure, a limited supply of glucose tablets, and the limitation of Burke's "housing units' commissary access as punishment for infractions" curtailed Burke's "access to the sugary products he needs." Motion at 12.

86.    The American Diabetes Foundation advises that "[c]ommissary staff should be educated in appropriate specific treatments for hypoglycemia, such as [providing hypoglycemic inmates with] 4 oz juice or 8 oz skim milk." Diabetes Management Statement at 547.

87.    "[W]hen Mr. Burke has suffered from severe hypoglycemia, the medical staff have determined it acceptable to feed him peanut butter, which is not sugar-rich enough to supplant soda or glucose tablets." Motion at 12.

88.    The challenges Burke has experienced in ensuring that his blood glucose levels remain stable have been made more difficult by the fact that Burke "does not have consistent monitoring of his blood sugar levels." Motion at 12.

89.    The American Diabetes Association recommends that "[p]eople with type 1 diabetes are at risk for hypoglycemia and should have [blood glucose monitoring] performed three

or more times daily or have access to [continuous glucose monitoring ("CGM")] technology."
Diabetes Management Statement at 551.

90. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

91. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

92.     Appropriate management of blood sugar levels, in addition to exercise, to which Burke does not have adequate access, see Motion Hearing Tr. at 23:6-9 (Fogel), "are critical to slowing the progression of kidney disease," Smith Medical Opinion at 3, and, accordingly, Burke's ability to engage in these activities bears directly on the "duration of [Burke's] life expectancy . . . ," Motion Hearing Tr. at 7:18-24 (Fogel).  See Mahendra Kumar et al., The Bidirectional Link Between Diabetes and Kidney Disease: Mechanisms and Management at 3, Cureus Journal of Medical Science (September 20, 2023)("Hyperglycemia, characterized by elevated blood glucose levels, is recognized as the primary underlying factor contributing to the development and progression of kidney disease in individuals with diabetes.").

93.     Burke's diabetes has led to the development of neuropathy, a condition that "causes weakness, numbness and pain," in his feet.  See Motion Hearing Tr. at 12:8-16 (Fogel); Peripheral Neuropathy,      Mayo      Clinic,      www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/symptoms-causes/syc-20352061 (last visited June 20, 2024).

- 19 -

4.      **Burke's Time in Prison and Release Plan**.

94.     Burke "is currently participating in the 500-hour Residential Drug Abuse Program."  Motion at 16.

95.     Burke is scheduled to be released from prison on January 22, 2025, see Jesse Burke, Inmate Locator, Federal Bureau of Prisons (last visited July 11, 2024); however, with the good-time credits Burke has accrued while serving his sentence, his estimated release date is November 14, 2024, see Motion Hearing Tr. at 48:4-13 (Fogel).

96.     If the Court were to release Burke early, Burke will reside with his parents, "with whom he is very close, in the home they own in Grants . . . ."  Motion at 18.  See Motion Hearing Tr. at 24:13-25:7 (Fogel).

97.     At sentencing, the United States Probation Office noted that Burke's parents' home "appeared to be a safe and suitable place for the defendant to reside upon his release from custody."  PSR ¶ 65, at 17.

98.     When Burke committed the underlying offense, he was not living at his parents' house, but was residing with his girlfriend at a separate residence.  See Motion Hearing Tr. at 27:3-10 (Fogel)

99.     Burke's parents will provide transportation for Burke's medical appointments.  See Motion at 18.

100.    There is a dialysis center .4 miles from Burke's parents' house in Grants.  See Motion Hearing Tr. at 22:13-14 (Fogel).

101.    Burke would be required to travel to Albuquerque, which is about an hour's drive from Grants, to be assessed for a kidney transplant, but it is likely that many of his regular

nephrology checkups could be conducted over video conference.  See Motion Hearing Tr. at 55:14-21 (Fogel).

102.    Burke would be able to resume "Medicaid insurance coverage" upon his release, Motion Hearing Tr. at 11:20-25 (Fogel), and will receive supplemental security income as financial support, see Motion at 18.

103.    ███████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████

104.    Burke currently has a "very stable" relationship with his girlfriend, and he speaks with her and the son they have together "on a daily basis."  PSR ¶ 66, at 18.

105.    The United States does not oppose Burke's Motion and agrees that his circumstances warrant compassionate release.  See Motion Hearing Tr. at 30:11-18 (Mattei).

**5.    Burke's Recent Medical Developments.**

106.    Following the April 10, 2024, hearing, Burke was transferred to the United States Medical Center for Federal Prisoners in Springfield, Missouri ("MCFP Springfield").  See Email from Christopher Aguilar to ██████████ at 5 (dated June 13, 2024), filed July 12, 2024 (Doc. 169)("Aguilar Email");   Jesse Burke, Federal Bureau of Prisons Inmate Locator, www.bop.gov/inmateloc, (last visited July 11, 2024).

107.    Burke is now "listed as a CARE LEVEL ████████████████ ████████████ Email from Wade Miller to ██████████ at 2 (dated June 13, 2024), filed June 20, 2024 (Doc. 169)("Miller Email").

108.   ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆   Email from Irma Brown to CSA-Referrals-S at 3 (dated June 3, 2024), filed June 20, 2024 (Doc. 169)("Brown Email").

109.   The Court's experience is that the BOP routinely places its defendants at Diersen Charities, a halfway house in Albuquerque, six months before their sentence is over, and they finish their sentence there.  See Email from Richard Reifenscheid to James Browning at 1 (dated May 8, 2024), filed May 12, 2024 (Doc. 168); Reentry Programs, Federal Bureau of Prisons, www.bop.gov/inmates/custody_and_care/reentry.jsp ("The BOP places appropriate inmates in Residential Reentry Centers prior to release to help them adjust to life in the community and find employment.").

110.   Burke is not currently eligible to be released to Dierson Charities or any other halfway house, because of his medical condition.  See Miller Email at 2 ("[I]t does not appear the defendant would be referred to RRC Diersen in ABQ, unless his CARE LEVEL was reduced . . . ."); Brown Email at 1 ("[T]his [Adult in Confinement] is NOT medically cleared for [Residential Reentry Center] placement at this time.").

111.   Burke is, however, "currently eligible for home detention on August 4, 2024." Miller Email at 1.  See Aguilar Email at 5 ("Per his BOP's computation data, he is eligible for home detention on 8/4/2024.").

**PROCEDURAL HISTORY**

Burke filed his Motion on February 23, 2024.  See Motion at 1.  The United States does not oppose Burke's requested sentence reduction.  See Motion at 3 ("The parties have conferred and the United States does not oppose this motion."); Motion Hearing Tr. at 30:11-31:3 (Mattei).

The Court held a hearing on the Motion on April 10, 2024.  See Clerk's Minutes at 1, filed April 10, 2024 (Doc. 165).  The Court briefly outlines Burke's arguments in his Motion and describes the parties' arguments at the April 5 Hearing.

       1.       __The Motion__.

In the Motion, Burke requests that the Court reduce his "term of incarceration to time-served," and extend his term of supervised release "to 4 years and 6 months, with the first 6 months to include home confinement as a condition of release."  Motion at 1.  Burke argues that his "declining health, need for and inability to access life-prolonging treatment while incarcerated, and the negative impact of his conditions of confinement on his ability to manage his medical conditions amount to extraordinary and compelling reasons" warranting his immediate release. Motion at 1-2.  Specifically, Burke contends that his end-stage CKD constitutes an extraordinary and compelling reason under U.S.S.G. § 1B1.13, and maintains that "the BOP is not providing Mr. Burke with adequate, let alone effective, medical care for his kidney failure."  Motion at 8-9.  See id. at 9-13 (describing how the BOP has frustrated Burke's ability to manage his Type 1 diabetes by limiting Burke's access to insulin, glucose, and proper food).  Burke states that the combined effect of his medical conditions, which include Celiac Disease, Gastroesophageal Reflux Disease, and Diabetic Neuropathy, see Motion at 13-15, constitute a "dangerous web of interdependent and symbiotic ailments," Motion at 15.  Burke argues that "he does not pose a threat to any person or his community," because he has a significant support network in Grants, New Mexico, the community to which he plans to return upon his release, and because he "has actively worked to rehabilitate himself" during his incarceration.  Motion at 15-16.  Finally, Burke argues that the relevant 18 U.S.C. § 3553(a) factors favor his release, because his criminal history is almost

entirely the result of his drug addiction and he is now "fully committed to his sobriety," and because he "has served more than 32-months of his originally imposed 60-month sentence." Motion at 16-17.

2.   **The Hearing**.

At the hearing, Burke began by clarifying that his CKD has now progressed to stage 5.  See Motion Hearing Tr. at 4:15-20 (Fogel)("I have received updated lab report from March 4, showing that he has progressed his [GFR]  rating has now dipped down to 13, which I confirmed with Dr. Smith who provided the medical opinion . . . that he's now in stage five.").  Burke described that two distinct statutory analyses support his release under 18 U.S.C. § 3582(c)(1)(A) and the U.S.S.G § 1B1.13 policy statement: (i) Burke is suffering from "a terminal illness," which U.S.S.G § 1B1.13(b)(1)(A) describes as an extraordinary and compelling circumstance; and (ii) Burke's medical circumstances diminish his ability to provide self-care while incarcerated, which U.S.S.G § 1B1.13(b)(1)(B) describes as an extraordinary and compelling circumstance.  See Motion Hearing Tr. at 5:20-6:12 (Fogel).  Burke clarified that § 1B1.13 is clear that an illness need not have a specific prognosis of life expectancy to be considered a terminal illness.  Motion Hearing Tr. at 8:2-6 (Fogel).  Burke explained that the goal of the reduced sentence that the United States and Burke agree is appropriate is "to largely respect the original sentence that the court imposed," by converting the sentence to time served but adding six months to Burke's supervised release to be served under home confinement.  Motion Hearing Tr. at 8:14-24 (Fogel).  See id. at 9:6-8 ("[I]n substance our request doesn't amount to a significant change in the duration of the originally imposed sentence.").  Regarding the 18 U.S.C. § 3553(a) factors, Burke argued that he has "diligently participated in rehabilitative programming" while incarcerated, has received a recent

- 24 -

progress report indicating that his "risk of recidivism is low," and "has not received any incident reports during his incarceration."   Motion Hearing Tr. at 9:8-23 (Fogel).

Burke described that, upon release, he would live with his parents in Grants, and that his parents would be able to assist him in getting to medical appointments.  See Motion Hearing Tr. at 11:4-20 (Fogel).  Burke explained that there is a "dialysis clinic that's just a half mile from [his parent's] home," at which Burke would be "immediately eligible" for treatment upon resumption of his "Medicaid insurance coverage," and Narcotics Anonymous meetings which Burke plans to attend "just a mile and a half from their home."   Motion Hearing Tr. at 11:20-12:2 (Fogel).  Burke provided that, upon release, the fact that he will "be locked in his house with his parents at home" makes it unlikely that he will return to using drugs.  Motion Hearing Tr. at 24:6-25:7 (Court, Fogel).  Burke clarified that, at the time he committed his offense of conviction, he was not living with his parents but was staying with a girlfriend.  See Motion Hearing Tr. at 27:3-10 (Fogel). Finally, Burke contended that he does not pose a danger to the community, because his criminal history is largely one of addiction, and because he "has neuropathy of the feet."  Motion Hearing Tr. at 12:8-16 (Fogel).  Burke emphasized that the primary reason for his compassionate release request was not so that he could die at home, but so  that"he can access the care he needs."  Motion Hearing Tr. at 14:3-17 (Court, Fogel).

The Court questioned Burke whether he would receive better care outside of prison upon his return to Grants.  Motion Hearing Tr. at 14:13-17 (Court)("Are we certain that he's going to get dialysis when he comes on the outside.  The BOP is not giving him dialysis, what makes us think that somebody in [G]rants is going to give him dialysis[?]"); id. at 16:24:17:2 (Court). In response, Burke explained that his CKD had progressed from stage 3 at sentencing to stage 5,

which is the most important factor indicating it is time to begin dialysis treatment, and he would

be able to access dialysis treatment with greater ease outside of prison, because access to dialysis

"is inconsistent . . . [a]nd unreliable" in the BOP system.  Motion Hearing Tr. at 15:18-16:15

(Court, Fogel).  Burke added that, in addition to better access to dialysis, "the process of getting

on the kidney transplant waiting list" could begin if Burke is released.  Motion Hearing Tr. at 17:3-

10 (Fogel).   Burke clarified that, while BOP does not "prohibit[]" dialysis and organ

transplantation, they are treatment options that "in practice don't occur."  Motion Hearing Tr. at

17:13-18 (Fogel).   The Court expressed its concern regarding Burke receiving a "mandatory

minimum" sentence and "then using compassionate release to go below the mandatory minimum."

Motion Hearing Tr. at 19:8-22 (Court).  Burke responded that he was "in a dire and tragic health

situation," and that "[t]he goal here is not in any way really to get even one less day off of the

sentence on the mandatory minimum," as the fact that Burke is requesting a longer period of

supervised release to be spent under home confinement exemplifies.  Motion Hearing Tr. at 19:23-

20:21 (Fogel).

The United States explained that it does not oppose the Motion, because, at the time of

sentencing, Burke was very sick and would soon be needing dialysis, but now his CKD had

progressed to "the point where he does need dialysis now."  Motion Hearing Tr. at 31:24-34:3

(Court, Mattei).  The Court explained that compassionate release motions involving medical issues

present unique challenges, because it is very hard for the Court to determine, from the record

before it, whether Burke truly needs dialysis and the BOP is denying Burke the treatment, or "that

there is [just a] genuine medical disagreement that he needs it."  Motion Hearing Tr. at 34:20-

35:16 (Court).  The United States responded that it understands the unsuccessful fistula surgery

which Burke underwent "la[id] groundwork for dialysis" and that the surgery indicated that the

BOP was "progressing down that road towards dialysis." Motion Hearing Tr. at 35:17-25 (Mattei).

The United States further explained that it believed that a reduction in Burke's sentence, with the

addition of 6 months of home confinement, is reasonable, given that Burke is scheduled to be

released in November, 2024, given the good-time credit he has accrued, see Motion Hearing Tr.

at 39:1-15 (Mattei), and that it does not "see particular dangerousness here at this stage . . . , given

the severity of these health conditions and given the conditions that would be imposed on home

confinement," Motion Hearing Tr. at 40:3-7 (Mattei).

   The Court informed the parties that, in its experience, the BOP is moving inmates to a

halfway house -- Dierson Charities, in Albuquerque -- 6 months ahead of their release, and the

probation officer present at the hearing confirmed that this is the current practice. Motion Hearing

Tr. at 42:11-43:7 (Court, Mattei, Probation Officer). Because Burke has "earned 108 days" of

good-time credit, Burke estimated that his release date is November 14, 2024, which the parties

agreed would mean Burke would likely be placed in a halfway house in May, 2024. Motion

Hearing Tr. at 48:4-13 (Fogel). See id. at 51:19-52:4 (Court). Burke contended that, in light of

the fact that he "will be transferred to a halfway house . . . in the next few months," his request to

be placed on home confinement is "more restrictive than the likely or normal path that was set out

in Mr. Burke's sentence . . . ." Motion Hearing Tr. at 47:3-18 (Fogel). In addition, Burke

explained that requiring him to first transition to a halfway house before his release, rather than

releasing him to home confinement, would be harmful to Burke's health and "inevitably . . . create

another period where he had a gap in care." Motion Hearing Tr. at 49:8-21 (Fogel). Burke

acknowledged that, if he were to be released, he would have to travel to Albuquerque, where the

halfway house to which he is likely to be released to is located, from Grants for his kidney transplant appointments.  See Motion Hearing Tr. at 54:21-23 (Lowry); id. at 55:14-21 (Fogel). The Court informed the parties that it would take the Motion under advisement.  See Motion Hearing Tr. at 55:24-56:6 (Court).

## LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making Guidelines sentencing ranges effectively advisory.  See United States v. Booker, 543 U.S. at 261.  In excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." United States v. Booker, 543 U.S. at 261.  Accordingly, even though the sentencing guidelines are not mandatory, courts must consult them for advice in arriving at an appropriate sentence.  See Peugh v. United States, 569 U.S. 530, 541-42 (2013).  The sentencing guidelines should provide a starting point for the court's determination of a proper sentence.  See Gall v. United States, 552 U.S. 38, 50 n.6 (2007)("[D]istrict courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."); Peugh v. United States, 569 U.S. at 541 ("The post-Booker federal sentencing scheme aims to achieve uniformity by ensuring that sentencing decisions are anchored by the Guidelines and that they remain a meaningful benchmark through the process of appellate review.").

Congress has directed sentencing courts to "impose a sentence sufficient, but not greater

than necessary, to comply with" the four statutorily defined purposes enumerated in

18 U.S.C. § 3553(a)(2):

> **(A)**     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> **(B)**     to afford adequate deterrence to criminal conduct;
>
> **(C)**     to protect the public from further crimes of the defendant; and
>
> **(D)**     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to further

consider: (i) "the nature and circumstances of the offense," as well as the defendant's "history and

characteristics"; (ii) the available sentences; (iii) the Guidelines; (iv) any pertinent Sentencing

Commission policy statements in effect on the date of sentencing; (v) the policy favoring

uniformity in sentences for defendants who commit similar crimes; and (vi) the need to provide

restitution to victims.  18 U.S.C. § 3553(a)(1), (3)-(7).

The United States Court of Appeals for the Tenth Circuit holds that, while the Guidelines

are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration.

See United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more

than "just one factor among many").  They are significant, because "the Guidelines are an

expression of popular political will about sentencing that is entitled to due consideration . . . ."

United States v. Cage, 451 F.3d at 593.  A court's careful consideration of the Guidelines is proper in light of the fact that "[t]he Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." Rita v. United States, 551 U.S. 338, 349 (2007).

"[A] sentence within the applicable Guidelines range is presumptively reasonable." United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349, as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th Cir. 2008).  This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.  See Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Rita v. United States, 551 U.S. at 351. Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[3] Guidelines sentence.  See Rita v. United States, 551 U.S. at 351; Gall v.

---

[3]Attorneys and courts often say that the Guidelines are advisory, but it is more accurate to say that the resulting Guidelines ranges are advisory.  See Gall v. United States, 552 U.S. 38, 46 (2007)("As a result of our decision [in United States v. Booker], the Guidelines are now advisory . . . ."); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory.").  The Court must consider the Guidelines, see Gall v. United States, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").  The Court is not mandated to apply, however, a sentence within the calculated Guidelines range.  See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . .").  Accord United States v. Chavez-Rodarte, No. CR 08-2499, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker

_____

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).
. . . .

The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States, 552 U.S. 85 (2007), that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. at 101 (alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, 30 F. Supp. 3d 1200, 1222-24 (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

> arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the <u>Booker</u> calculus, even if the court does not grant a downward departure.

<u>United States v. Apodaca-Leyva</u>, No. CR 07-1479, 2008 WL 2229550, at *6 (D.N.M. February 13, 2008)(Browning, J.). The Supreme Court has recognized, however, that sentencing judges are "in a superior position to find facts and judge their import under § 3553(a) in each particular case." <u>Kimbrough v. United States</u>, 552 U.S. at 89. A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a). <u>See</u> <u>United States v. Booker</u>, 543 U.S. at 261-62.

## LAW REGARDING COMPASSIONATE RELEASE

Federal courts generally cannot modify a term of imprisonment after it has imposed a sentence. <u>See</u> <u>Freeman v. United States</u>, 564 U.S. 522, 526 (2011). Nevertheless, this "rule of finality is subject to a few narrow exceptions," including when a defendant moves for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A). <u>United States v. Maumau</u>, 993 F.3d 821, 830 (10th Cir. 2021)("<u>Maumau</u>"). Section 3582(c)(1)(A), commonly known as the compassionate release statute, allows a defendant to move the court for early release from prison provided certain conditions are met.[4] First, § 3582(c)(1)(A) "requires exhaustion before a court may consider a

---

[4]Before the passage of the First Step Act of 2018, Pub. L. No. 115-39132 Stat 5194 (December 21, 2018)("First Step Act"), 18 U.S.C. § 3582 permitted only the BOP Director to ask the court for a defendant's compassionate release. <u>See</u>, <u>e.g.</u>, <u>United States v. Smartt</u>, 129 F.3d 539, 541 (10th Cir. 1997)(explaining that a prisoner was not eligible for compassionate release absent motion from BOP Director). The First Step Act, however, amends § 3582 to enable defendants to petition the court for compassionate release after exhausting administrative remedies. <u>See</u> <u>United States v. Maumau</u>, 993 F.3d 821, 830 (10th Cir. 2021)("<u>Maumau</u>")(discussing the First Step Act's changes to § 3582).

motion for compassionate release." United States v. Hemmelgarn, 15 F.4th 1027, 1030 (10th Cir. 2021). A defendant satisfies this exhaustion requirement if: (i) "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf"; or (ii) thirty days have lapsed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).[5]

If a defendant satisfies the exhaustion requirement, district courts follow a three-part test to evaluate a defendant's compassionate release motion. See United States v. McGee, 992 F.3d 1035, 1042-43 (10th Cir. 2021)("McGee")(citing United States v. Jones, 980 F.3d 1098, 1107 (6th Cir. 2020)); United States v. Haworth, No. CR 95-0491, 2023 WL 8112827, at *10-16 (D.N.M. November 22, 2023)(Browning, J.)(assessing a compassionate release motion under McGee's three-part test). First, the court must determine whether extraordinary and compelling reasons

---

[5]In the United States Court of Appeals for the Tenth Circuit, this exhaustion requirement is a mandatory claim-processing rule, meaning the requirement is not "jurisdictional," and "challenges based on the failure to exhaust 'can be waived or forfeited.'" United States v. Hemmelgarn, 15 F.4th 1027, 1030-31 (10th Cir. 2021)("[M]andatory claim-processing rules do not implicate the courts' adjudicatory authority . . . ."). See United States v. Nash, No. 19-40022, 2022 WL 2072733, at *1 (D. Kan. June 9, 2022)(Crabtree, J.)("[T]his exhaustion requirement is a claim-processing rule that the government may waive or forfeit."). For example, in United States v. Hemmelgarn, the Tenth Circuit considered the defendant's motion for compassionate release, even though the defendant "failed to provide proof that he exhausted his administrative remedies," because "the government did not argue exhaustion on appeal." 15 F.4th at 1031. Before United States v. Hemmelgarn, the Tenth Circuit suggested that the exhaustion requirement is jurisdictional and, therefore, not subject to waiver. See, e.g., United States v. Johnson, 849 F. App'x 750, 753 (10th Cir. 2021)("In this circuit, however, § 3582(c)(1)(A)'s exhaustion requirement is mandatory, rather than judicially waivable."); United States v. Gonzales, 547 F. Supp. 3d 1083, 1109 (D.N.M. 2021)(Browning J.)("[T]he Tenth Circuit has continued to impose the exhaustion requirement as mandatory and not judicially waivable despite the COVID-19 pandemic."), aff'd, No. 21-2060, 2021 WL 5985347 (10th Cir. Dec. 17, 2021); United States v. Heath, No. CR-13-102, 2020 WL 1957916, at *2 (W.D. Okla. April 23, 2020)(Palk, J.)(collecting cases).

warrant a sentence reduction.  See McGee, 992 F.3d at 1042; 18 U.S.C. § 3582(c)(1)(A)(i).

Second, the court must find whether such a reduction is consistent with applicable policy

statements that the Sentencing Commission has issued.  See McGee, 992 F.3d at 1042.  Third, the

court must consider whether a reduction aligns with the applicable 18 U.S.C. § 3553(a) factors.

See McGee, 992 F.3d at 1042.  Defendants must satisfy all three requirements, and, accordingly,

district courts may deny a compassionate release motion on any of the three steps without

addressing the others.  See United States v. Hald, 8 F.4th 932, 942-43 (10th Cir. 2021)("If the most

convenient way for the district court to dispose of a motion for compassionate release is to reject

it for failure to satisfy one of the steps, we see no benefit in requiring it to make the useless gesture

of determining whether one of the other steps is satisfied."), cert. denied, 142 S. Ct. 2742 (2022);

McGee, 992 F.3d at 1042.  Conversely, courts must address all three steps when granting a motion

for compassionate release.  See Maumau, 993 F.3d at 831 n.4.

> **1.**      **Extraordinary and Compelling Reasons.**

At the first step of the three-part compassionate release test, courts must determine whether

"extraordinary and compelling reasons warrant" a sentence reduction.    18 U.S.C.

§ 3582(c)(1)(A)(i).  See McGee, 992 F.3d at 1042.  District courts "have the authority to determine

for themselves what constitutes extraordinary and compelling reasons."  United States v. Hald, 8

F.4th at 938 n.4.  See McGee, 992 F.3d at 1044 ("Congress intended to afford district courts with

discretion, in carrying out the first step of the statutory test in § 3582(c)(1)(A)(i), to independently

determine the existence of extraordinary and compelling reasons . . . .").  This discretion, however,

"is bounded by the requirement under step two of the statutory test that a reduction in sentence be

consistent with applicable policy statements issued by the Sentencing Commission."  Maumau,

- 34 -

993 F.3d at 832.  The Court has "deriv[ed] its test for extraordinary and compelling circumstances from the words' dictionary definitions."  United States v. Gonzales, 547 F. Supp. 3d 1083, 1124-25 (D.N.M. 2021)(Browning, J.), aff'd, No. 21-2060, 2021 WL 5985347 (10th Cir. December 17, 2021).  Black's Law Dictionary defines extraordinary as "[b]eyond what is usual, customary, regular, or common," Extraordinary, Black's Law Dictionary (11th ed. 2019), and the New Oxford American Dictionary defines compelling as "evoking interest, attention, or admiration in a powerfully irresistible way; not able to be refuted, inspiring conviction; not able to be resisted, overwhelming," Compelling, New Oxford American Dictionary (3d ed. 2010).  See United States v. Haworth, 2023 WL 8112827, at *11 ("Haworth has not demonstrated that the risks posed by COVID-19 extend '[b]eyond what is usual, customary, regular, or common . . . .'" (quoting Extraordinary, Black's Law Dictionary (11th ed. 2019))).  Accord United States v. Castano-Vasquez, 266 F.3d 228, 233 (3d Cir. 2001).

Courts commonly consider whether a defendant's medical condition constitutes extraordinary and compelling reasons.  In determining whether medical issues warrant a defendant's release, courts evaluate: (i) the severity of the defendant's medical conditions, including whether a condition is terminal, see United States v. Bauer, 554 F. Supp. 3d 1109, 1112-13 (D.N.M. 2021)(Johnson, C.J.)(concluding that the defendant's numerous, serious, and irreparable debilitations demonstrated extraordinary and compelling reasons to reduce his sentence, even though the defendant had an extensive criminal history); United States v. Lopez, 487 F. Supp. 3d 1156, 1158 (D.N.M. 2020)(Vázquez, J.)(recognizing that "where the defendant is suffering from a terminal illness," compassionate release may be warranted); but see United States v. Chambliss, 948 F.3d 691, 693-94 (5th Cir. 2020)(affirming a denial of a request for

compassionate release where the defendant had a terminal disease, because the defendant had committed a serious drug crime and previously had committed aggravated robbery); (ii) the defendant's age, because older inmates are more likely to have serious diseases, are more likely to have served a significant portion of their sentence, and are less likely to be a danger to society if released, see United States v. Johns, No. CR 91-392, 2019 WL 2646663, at *3 (D. Ariz. June 27, 2019)(Jorgenson, J.)(granting release to an eighty-one-year-old defendant who served almost twenty-three years of his sentence, could no longer go to the cafeteria to eat, had a fading memory, and was the oldest inmate at the facility); but see United States v. Slater, 547 F. Supp. 3d 58, 87 (D. Me. 2021)(Woodcock, J.)(denying compassionate release despite that the defendant was elderly and suffered from numerous health conditions, because the defendant was not entirely incapacitated and could still cause serious harm with a gun); and (iii) whether the defendant is receiving adequate care while incarcerated, see United States v. Beck, 425 F. Supp. 3d 573, 581 (M.D. N.C. 2019)(Eagles, J.)(granting a motion for compassionate release in part because of the "abysmal health care" that the BOP provides); United States v. Eccleston, 543 F. Supp. 3d 1092, 1140 (D.N.M. 2021)(Browning, J.)("S. Eccleston's medical difficulties do not present extraordinary and compelling circumstances, because the record indicates that the BOP manages effectively his chronic conditions . . . .").[6]

---

[6]Generally speaking, it is very difficult for the Court to decide: (i) whether the BOP's medical care has been poor; and (ii) whether that poor care has compromised the defendant's prospects of survival in a compassionate release case.  Normally, poor medical care in prison is addressed in civil cases and not in criminal cases.  See Ramos v. Martinez, No. CIV 17-0120, 2019 WL 7049620, at *3 (D.N.M. December 23, 2019)(Browning, J.)("Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain that the Eighth Amendment proscribes.").  Typically, the courts do not deal with medical care in the criminal context, but wait for a Bivens v. Six Unknown Named Agents of Fed. Bureau of

Narcotics, 403 U.S. 388 (1971)("Bivens") action under the Eighth Amendment.  See, e.g., Carlson v. Greene, 446 U.S. 14, 20 (1980); Estelle v. Gamble, 429 U.S. 97, 104 (1976); Richardson v. Daniels, 557 F. App'x 725, 728 (10th Cir. 2014)(affirming dismissal of a prisoner's Bivens claim which alleged that the defendants "violated his Eighth Amendment rights in connection with their response to a seizure he had," where "corrections officers responded to his seizure, he received prompt medical attention and has been given medicine to treat seizures").  Cf. Moya v. San Juan Cnty. Adult Det. Ctr., No. CIV 20-0431, 2022 WL 16924001, at *3-5 (D.N.M. November 14, 2022)(Browning, J.)(recognizing that § 1983 is the proper avenue for pre-trial detainees to vindicate their medical claims).

        The efficient solution to poor medical care in a prison setting is neither to redo a sentence nor to release the defendant.  It seems strange that federal courts do not deal with medical protection in criminal cases unless detention center circumstances jeopardize the defendant's right to effective assistance of counsel, see United States v. Boigegrain, 155 F.3d 1181, 1186 (10th Cir. 1998)("[I]t was impossible for the district court to allow the defendant to waive counsel before determining whether he was competent to stand trial."), but, once a defendant goes to prison, courts may use poor medical care to release a defendant, see, e.g., United States v. Beck, 425 F. Supp. 3d 573, 586 (M.D.N.C. 2019)(Eagles, J.)(granting a prisoner's compassionate release motion "given her breast cancer and the poor treatment she has received at BOP").  Instead, Bivens actions are a more suitable remedy to problems with prison medical care rather than compassionate release motions.  Unless the parties are willing to present the court with a robust evidentiary record, the court is left with the uneasy feeling that it is dealing with a pro se prisoner's complaint that is often seen in Bivens actions -- skeptical that the situation is as bad as the pro se prisoner says it is.

        Moreover, it is difficult for a district court to compare medical care.  Often, a defendant, when released, has no medical insurance, and his or her care is problematic.  It is not clear how the court should compare the care in a medical BOP Facility with care on the outside, particularly where the court must speculate regarding the quality of medical a defendant might receive once released.  Further, it is very difficult for a district court to know, without the discovery and experts it has in a civil case, whether the defendant is the problem or whether the facility is the problem.  See Nicholson v. Evangelical Lutheran Good Samaritan Soc'y, Inc., No. CIV 16-0164, 2017 WL 3127799, at *29 (D.N.M. July 21, 2017)(Browning, J.)(stating that, in a medical malpractice case, the plaintiff must "use expert medical testimony," because, where "'the cause and effect of a physical condition lies in a field of knowledge in which only a medical expert can give a competent opinion,' a plaintiff must introduce expert medical testimony that establishes causation" (quoting Woods v. Brumlop, 1962-NMSC-133, ¶ 15, 71 N.M. 221, 225, 377 P.2d 520, 523, and citing O'Banion v. Owens Corning Fiberglass Corp., 968 F.2d 1011, 1013 (10th Cir. 1992)(affirming an order that excluded evidence of cancer where plaintiff presented no evidence "from a qualified medical expert stating that there is a reasonable medical probability the Plaintiff will have a cancer condition from his asbestos related disease"))).

        Accordingly, courts should proceed with caution when they encounter the thin medical record that often exists in criminal cases.  Moreover, presenting courts with voluminous medical records is not very helpful where the litigation lacks expert testimony and a true adversarial process, as is often the case in compassionate release motions.  On this basis, the court cannot

Since the emergence of COVID-19, the Court has considered whether the risks the virus poses constitute extraordinary and compelling reasons.  General concerns about potential exposure to COVID-19 alone do not demonstrate an extraordinary and compelling reason for a reduced sentence.  See United States v. Wood, No. CR 14-2446, 2020 WL 4016058, at *2  (D.N.M. July 16, 2020)(Browning, J.)("'[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release.'" (quoting United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020))).  Rather, a defendant must demonstrate that his or her medical conditions make acquiring COVID-19 more likely or increase the risk that the defendant will experience a severe case of COVID-19 upon contraction of the virus.  See United States v. Hemmelgarn, 15 F.4th at 1031 ("The district court's finding that these medical conditions identified by Hemmelgarn do not place him at a risk of severe illness from COVID-19 is not clearly erroneous."); United States v. Baca, No. CR 16-1613, 2020 WL 5369078, at *15 (D.N.M. September 8, 2020)(Browning, J.)("[C]ases in which COVID-19 is a factor for compassionate release require more than speculative complications.").

In determining whether the risk of severe COVID-19 from a medical condition constitutes an extraordinary and compelling reason, the United States has, in some cases, "concede[d] that having a CDC-identified COVID-19 risk factor satisfies the extraordinary and compelling prong of § 3582(c)(1)(A)(i)."  United States v. Loughry, No. CR 08-0132, 2020 WL 7319077, at *3 (S.D. Ind. Dec. 10, 2020)(Barker, J.)(listing cases).  See United States v. Gonzales, 547 F. Supp. 3d at

---

evaluate meaningfully whether the defendant has properly requested medical assistance, whether the facility has improperly denied the requested care, and how severe the defendant's health condition is.  See United States v. Gonzales, 547 F. Supp. 3d at 1118.

1100 ("The United States . . . admits that Gonzales' case satisfies the extraordinary and compelling circumstances requirement, [because] Gonzales' asthma and severe obesity 'are clearly identified as risk factors by the CDC.'" (quoting the record)).  The Court has concluded, however, that the defendant's suffering from a medical condition that the CDC has identified as a COVID-19 risk factor (a "listed condition") does not compel the conclusion that the defendant has demonstrated extraordinary and compelling circumstances.  See United States v. Gonzales, 547 F. Supp. 3d at 1100 (disagreeing with the United States' "blanket concession" that, "where an individual is incarcerated and has a condition that the CDC asserts creates a heightened risk of COVID-19 complications . . . , that person presents extraordinary and compelling circumstances," and concluding that "the Court must[] evaluate each case on an individualized basis").  The Tenth Circuit agrees that, while district courts may rely on CDC guidance in determining whether extraordinary and compelling reasons exist, they are not bound to conclude that such conditions exist by the mere fact that an inmate's medical condition is a listed condition:

> Mr. Mendoza-Contreras appears to contend that district courts lack discretion to deny compassionate release to any inmate who has an underlying medical condition that increases his risk of severe illness from COVID-19.  We reject that proposition as inconsistent with the district court's broad discretion to determine what constitutes extraordinary and compelling reasons under § 3582(c)(1)(A)(i).

United States v. Mendoza-Contreras, No. 22-5057, 2023 WL 2706808, at *3 (10th Cir. March 30, 2023).  In addition, "access to vaccination . . . weigh[s] against a finding of extraordinary and compelling reasons," United States v. Hald, 8 F.4th at 939 n.5; see United States v. Jefferson, No. 22-8067, 2023 WL 5572550,  at *2 (10th Cir. August 29, 2023)(collecting cases), and numerous courts have held "that an inmate's denial of a COVID-19 vaccination weighs against a finding of extraordinary and compelling circumstances," United States v. Baeza-Vargas, 2021 WL 1250349,

at *2-3 (D. Ariz. April 5, 2021)(Teilborg, J.).

In addition to a defendant's medical concern, courts have cited a change in sentencing, such that the defendant would be given a significantly lower sentence now compared to the original sentence as an extraordinary and compelling circumstance. See Maumau, 993 F.3d at 837 (agreeing with the district court that the length of the defendant's sentence, and the fact that the defendant would not receive the same sentence if the crime occurred today, supported a finding of extraordinary and compelling reasons); United States v. Eccleston, 543 F. Supp. 3d at 1144-45 (identifying the defendant's "reasonable, but incorrect, belief when he signed his State and federal Plea Agreements that his state and federal sentences would run concurrently" as one factor among many that "persuades the Court to find extraordinary and compelling circumstances"). Courts nevertheless must be cautious when considering circumstances surrounding a defendant's sentence as part of the extraordinary and compelling analysis to accord due respect to Congress' province to fix criminal penalties:

> The length of the sentence cannot be an extraordinary and compelling reason to grant compassionate release because this would infringe on the legislature's province to fix penalties. This is especially true when mandatory minimums are involved. In essence, Andrews asks the Court to reevaluate his sentence and fashion its own brand of justice. But to do so in this manner would intrude on legislative prerogatives.

United States v. Andrews, 480 F. Supp. 3d 669, 678-79 (E.D. Pa. 2020)(Robreno, J.), aff'd, 12 F.4th 255 (3d Cir. 2021). The Court has concluded, for example, that "prospective statutory changes generally do not result in extraordinary and compelling circumstances warranting compassionate release." United States v. Eccleston, 543 F. Supp. 3d at 1141-42 (citing Van Skiver v. United States, 952 F.2d 1241, 1245 (10th Cir. 1991)). Furthermore, some courts have held that

care needs for the defendant's family members also may support the defendant's request for compassionate release.  See United States v. Washburn, No. 10-2456, 2023 WL 3853343, at *4 (D.N.M. June 6, 2023)(Urias, J.)("Defendant has established that the circumstances involving his mother's caregiving contributes to a finding of extraordinary and compelling reasons that warrant his compassionate release because he is the only available caregiver for her."); Sentencing Guidelines for United States Courts, 88 Fed. Reg. 28257 (May 3, 2023)("[A] parent has been the family member most often identified as needing care by courts granting sentence reductions."). But see United States v. Haworth, 2023 WL 8112827, at *10 ("Haworth has not demonstrated that his mother's medical condition is sufficiently serious to warrant his release to assist in her care."). Finally, Congress has expressed that "'[r]ehabilitation of the defendant alone . . . shall not be considered an extraordinary and compelling reason.'"  McGee, 992 F.3d at 1044 (quoting 28 U.S.C. § 994(t)).

### 2.      The U.S.S.G. § 1B1.13 Policy Statement and the 2023 Amendments.

At the second step of the three-part test for considering motions for compassionate release, courts consider whether a "reduction is consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A).  See McGee, 992 F.3d at 1042.  Congress has directed the Sentencing Commission to promulgate "general policy statements" regarding the appropriate use of the sentence modification provisions set forth in § 3582(c).  28 U.S.C. § 994(a)(2)(C).  Congress has called upon the Sentencing Commission, in promulgating these general policy statements, to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t).  Applicable policy statements do not define "exclusively" what courts may

- 41 -

consider extraordinary and compelling reasons for a sentence reduction; rather, policy statements "describe those characteristic or significant qualities or features that typically constitute 'extraordinary and compelling reasons.'" McGee, 992 F.3d at 1045 (quoting § 3582(c)(1)(A)). In short, "Congress intended for the Sentencing Commission's policy statements to serve as guideposts for district courts under the second part of the statutory test." McGee, 992 F.3d at 1048.

On November 1, 2023, the Sentencing Commission issued an applicable policy statement for motions for compassionate release filed by defendants by amending § 1B1.13. See U.S.S.G. §1B1.13, Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A) (Policy Statement). Before the promulgation of the updated § 1B1.13 policy statement, the Tenth Circuit had held that there were no current applicable policy statements from the Sentencing Commission, because the then existing policy statement was "applicable only to motions filed by the Director of the BOP, and not to motions filed directly by defendants." Maumau, 993 F.3d at 837. At the time, § 1B1.13 referred only to motions that the BOP director filed, because § 1B1.13 was issued shortly before the passage of the First Step Act of 2018, Pub. L. No. 115-39132 Stat 5194 (December 21, 2018)("First Step Act"), which, for the first time, provided defendants with the ability to bring motions for compassionate release. See U.S.S.G. § 1B1.13(a) (2018)(amended 2023). The Tenth Circuit reasoned that, because § 1B1.13 did not recognize that defendants could bring compassionate release motions, the policy statement was not applicable to motions brought by defendants. See McGee, 992 F.3d at 1050 ("[T]he Sentencing Commission's most recent policy statement, which was issued prior to the First Step Act, is not applicable."); United States v. Carr, 851 F. App'x 848, 853 (10th Cir. 2021)(reversing a district court where the district court relied on the policy statement, because, "[a]lthough it was within the district court's discretion to conclude

the application notes to U.S.S.G. § 1B1.13 still provided the best definition and description of extraordinary and compelling reasons under the circumstances," it was "not apparent the district court recognized U.S.S.G. § 1B1.13 was no longer controlling").  But see United States v. Bryant, 996 F.3d 1243, 1247 (11th Cir. May 7, 2021)("The Commission's standards are still capable of being applied and relevant to all Section 3582(c)(1)(A) motions, whether filed by the BOP or a defendant. . . .  1B1.13 is still an applicable policy statement for a Section 3582(c)(1)(A) motion, no matter who files it.").

The 2023 amendments expressly "revise[] § 1B1.13(a) to reflect that a defendant is now authorized to file a motion under 18 U.S.C. § 3582(c)(1)(A), making the policy statement applicable to both defendant-filed and BOP-filed motions."  88 Fed. Reg. 28256-57.  Compare U.S.S.G. § 1B1.13(a) (2018)(amended 2023)("Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ."), with U.S.S.G. § 1B1.13(a) (2023)("Upon motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . .").  Under § 1B1.13, courts still may decide on their own what constitutes extraordinary and compelling reasons, but, where a court recognizes a circumstance that is not identified specifically in the policy statement, the circumstance must be comparably serious to the identified reasons to be "consistent" with the policy statement.  18 U.S.C. § 3582(c)(1)(A).  See U.S.S.G. § 1B1.13(b)(5) (clarifying that courts may conclude that "extraordinary and compelling reasons exist" where "[t]he defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the [explicitly identified extraordinary and compelling] reasons . . . , are similar in gravity to the [explicitly

identified extraordinary and compelling reasons").  In addition, the 2023 amendment expands the

list of "extraordinary and compelling reasons" in § 1B1.13's application notes in numerous ways.

For example, the amendment: (i) revises the "Medical Circumstances of the Defendant" subsection

to include "medical circumstances not expressly identified in §1B1.13 that were most often cited

by courts in granting sentence reduction motions during the pandemic"; (ii) adds a new provision

for cases in which a defendant's parent is incapacitated to the "Family Circumstances" subsection;

(iii) and creates new subsections for "unusually long sentences" and for defendants who have been

victims of "sexual assault perpetrated by BOP personnel."  88 Fed. Reg. 28257.

   **3.   The 18 U.S.C. § 3553(a) Factors.**

   At the third step of the three-part compassionate release test, courts must consider "the

factors set forth in section 3553(a) to the extent that they are applicable," 18 U.S.C.

§ 3582(c)(1)(A), and "'determine whether . . . the reduction authorized by [steps one and two] is

warranted in whole or in part under the particular circumstances of the case,'" McGee, 992 F.3d

at 1042 (quoting United States v. Jones, 980 F.3d at 1107)(brackets in McGee).  "Section[] 3553(a)

describes the factors courts should consider when sentencing defendants."  United States v.

Eccleston, 543 F. Supp. 3d at 1147.  Specifically, Congress has directed sentencing courts to

impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily

defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

   (A)   to reflect the seriousness of the offense, to promote respect for the
   law, and to provide just punishment for the offense;

   (B)   to afford adequate deterrence to criminal conduct;

   (C)   to protect the public from further crimes of the defendant; and

   (D)   to provide the defendant with needed educational or vocational

training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).   See   18 U.S.C. § 3551 ("[A] defendant . . . shall be sentenced . . . so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) . . . ."). The other applicable sentencing factors that the Court must consider are: (i) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (ii) "the kinds of sentences available"; (iii) "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines"; (iv) "any pertinent policy statement"; (v) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and (vi) "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(1), (3)-(7). "[T]he Supreme Court has determined that courts may consider post-sentencing conduct in assessing the § 3553(a) factors when considering whether to adjust a previously imposed sentence." United States v. Allen, 956 F.3d 355, 358 (6th Cir. 2020)(citing Pepper v. United States, 562 U.S. 476, 487-93 (2011)). See United States v. Gonzales, 547 F. Supp. 3d at 1139 ("The Court . . . will apply the § 3553(a) factors to Gonzales' pre-sentencing conduct as well as his conduct after the Court imposed his sentence in 2016."); United States v. Eccleston, 543 F. Supp. 3d at 1148-51 (concluding that the defendant's post-conviction history, including complete lack of disciplinary record and significant rehabilitation programming while incarcerated, outweighed the defendant's pre-conviction criminal history, particularly considering the defendant's young age at the time he committed the offense of conviction).

## ANALYSIS

The Court "generally 'may not modify a term of imprisonment once it has been imposed.'" Dillon v. United States, 560 U.S. 817, 819 (2010)(quoting 18 U.S.C. § 3582(c)). In 2018, Congress created an exception to this general rule and allowed defendants who had exhausted their administrative remedies to petition district courts directly for compassionate release. See 18 U.S.C. § 3582(c)(1)(A). After a defendant satisfies § 3582(c)(1)(A)'s exhaustion requirement, a district court may grant a motion for reduction of sentence only if three requirements are met: (i) the district court finds that extraordinary and compelling reasons warrant such a reduction; (ii) the district court finds that such a reduction is consistent with applicable policy statements that the Sentencing Commission issued; and (iii) the district court considers the factors set forth in § 3553(a), to the extent that they are applicable, and concludes that the factors warrant a reduction in the defendant's sentence. See Maumau, 993 F.3d at 821.

As a threshold matter, the Court concludes that Burke has satisfied § 3582's administrative exhaustion requirement. On April 11, 2023, Burke sent Lynne B. Kelly, the FCI Butner warden, a letter requesting that the BOP file a compassionate release motion on his behalf. See Letter from Elana Fogel to Warden Lynne B. Kelly at 3 (dated April 11, 2023), filed February 23, 2024 (Doc. 157-4)("Warden Letter"); Motion at 4. The Warden Letter was delivered on April 17, 2023. See Warden Letter at 2. Because more than thirty days have passed since Warden Kelly's receipt of the Warden Letter, the Court concludes that Burke has exhausted his administrative remedies. See 18 U.S.C. § 3582(c)(1)(A).

Having concluded that Burke has exhausted his administrative remedies, the Court considers whether Burke has satisfied the three-part test for compassionate release motions. See

United States v. Bonilla, No. 23-5096, 2024 WL 1672366, at *2 (10th Cir. April 18, 2024)("Before granting a compassionate-release motion, district courts must address three steps.").  To grant a motion for compassionate release,

> a district court must (1) "find whether extraordinary and compelling reasons warrant a sentence reduction"; (2) "find whether such reduction is consistent with applicable policy statements issued by the Sentencing Commission";[] and (3) "consider any applicable 18 U.S.C. § 3553(a) factors and determine whether, in its discretion, the reduction authorized by steps one and two is warranted in whole or in part under the particular circumstances of the case."

United States v. Bradley, 97 F.4th 1214, 1217 (10th Cir. 2024)(quoting United States v. Hald, 8 F.4th at 937-38).  At the first step of the compassionate release test, district courts "have the authority to determine for themselves what constitutes extraordinary and compelling reasons." United States v. Hald, 8 F.4th at 938 n.4.  See McGee, 992 F.3d at 1044 ("Congress intended to afford district courts with discretion, in carrying out the first step of the statutory test in § 3582(c)(1)(A)(i), to independently determine the existence of extraordinary and compelling reasons . . . .").  This discretion, however, "is bounded by the requirement under step two of the statutory test that a reduction in sentence be consistent with applicable policy statements issued by the Sentencing Commission." Maumau, 993 F.3d at 832.

The Tenth Circuit previously had held that the U.S.S.G. § 1B1.13 policy statement did not constrain district courts considering compassionate release motions brought by defendants; however, following November 1, 2023, amendments to the Guidelines, which "reflect that compassionate release motions may be brought by either the Director of the Bureau of Prisons or the defendant," the Tenth Circuit recognizes that the § 1B1.13 policy statement "is now plainly applicable to motions for sentence reductions filed by either the Director of the Bureau of Prisons

or a defendant." United States v. Bradley, 97 F.4th at 1217 n.1.  See United States v. Thompson,

2024 WL 1557126, at *19 (D.N.M. April 10, 2024)(Browning, J.)("[T]he Court concludes that

U.S.S.G. § 1B1.13 is now an applicable policy statement and that the Court must, therefore,

consider whether a reduction in Thompson's sentence would be consistent with § 1B1.13.").  In

addition to district courts' authority to determine what constitutes extraordinary and compelling

circumstances in the first instance, district courts may also look to the U.S.S.G. § 1B1.13 policy

statement, which provides a list of circumstances under which extraordinary and compelling

circumstances exist.  See U.S.S.G. § 1B1.13(b) ("Extraordinary and compelling reasons exist

under any of the following circumstances or a combination thereof . . . ."); United States v. Hald,

8 F.4th at 938 n.4 ("[I]t would hardly be an abuse of discretion for a district court to look to the

present policy statement for guidance.").

     Burke's primary argument is that his health conditions ███████████████████

██████████████████████████████ for which he is not receiving adequate medical care

while incarcerated, constitute extraordinary and compelling reasons for his release.  Motion at 5-

15.  Burke contends that the reduction he requests is consistent with the § 1B1.13 policy statement,

because § 1B1.13  "describes 'extraordinary and compelling reasons' specifically to include 'a

serious advanced illness with an end of life trajectory,'" see Motion at 8 (quoting 18 U.S.S.G.

§1B1.13(b)(1)(A)), and Burke no longer presents a danger to any other person or the community,

see Motion at 15-16.  Last, Burke argues that a reduction in his sentence is consistent with the 18

U.S.C. § 3553(a).  Motion at 16-17.  The United States does not oppose the motion and agrees that

Burke's circumstances warrant his compassionate release.  See FOF ¶ 105, at 21.  The Court

concludes that: (i) Burke's medical conditions, ████████████████████████████████

███████████████████████████████ constitute extraordinary and compelling reasons meriting a reduction in his sentence; (ii) the sentence reduction that Burke requests is consistent with the U.S.S.G. § 1B1.13 policy statement, because Burke suffers from a terminal illness pursuant to § 1B1.13(b)(a)(A), and because the Court concludes, on the basis of Burke's medical condition and non-violent criminal history, that Burke is not a danger to any other person or the community; and (iii) a reduction in Burke's does not align with the 18 U.S.C. § 3553(a) factors, because the reduced sentence does not sufficiently reflect the seriousness of Burke's offense, promote respect for the law, or provide just punishment, and because Burke's underlying offense and criminal history are serious. Accordingly, the Court concludes that Burke is not entitled to compassionate release and denies the Motion.

## I.    BURKE'S MEDICAL CONDITIONS CONSTITUTE AN EXTRAORDINARY AND COMPELLING REASON TO REDUCE HIS SENTENCE.

At the first step of the three-part compassionate release test, the Court determines whether "extraordinary and compelling reasons warrant" a sentence reduction. 18 U.S.C. § 3582(c)(1)(A)(i). See McGee, 992 F.3d at 1042. While the Court has "the authority to determine what constitutes extraordinary and compelling reasons," United States v. Hald, 8 F.4th at 938 n.4, this discretion "is bounded by the requirement under step two of the statutory test that a reduction in sentence be consistent with applicable policy statements issued by the Sentencing Commission," Maumau, 993 F.3d at 832. District courts may look to the U.S.S.G. § 1B1.13 policy statement, which provides a list of circumstances under which extraordinary and compelling circumstances exist, to guide inform their analysis under the first step of the statutory test. See United States v.

Hald, 8 F.4th at 938 n.4.  The Court concludes that Burke's circumstances present extraordinary and compelling reasons warranting compassionate release.

First, Burke's medical conditions, which are serious and extensive, are "[b]eyond what is usual, customary, regular, or common."  Extraordinary, Black's Law Dictionary (11th ed. 2019). Burke is now suffering from ████████, see FOF ¶ 52, at 11, which means ████████████ ████████████████████████████████████████████ ████████████████████████, see FOF ¶¶ 50, 66, at 11, 14; United States v. Holloway, No. CR 09-0030, 2021 WL 4710819, at *3 (W.D. Va. October 8, 2021)(Urbanski, C.J.)("[T]he court finds that Holloway's Stage V chronic kidney disease and worsening condition . . . present 'extraordinary and compelling' reasons to reduce his sentence."  (no citation given for quotation)); United States v. Salley, No. CR 19-688, 2022 WL 267895, at *5-6 (E.D. Pa. January 27, 2022)(Kearney, J.)(concluding that the defendant's "chronic kidney disease stage 4" constitutes an extraordinary and compelling reason). Burke's CKD has reached its end-stage.  Cf. United States v. Davidson, No. CR 16-0139, 2020 WL 4877255, at *18 (W.D. Pa. Aug. 20, 2020)(Hornak, C.J.)("While it is anticipated that Mr. Davidson will reach end-stage in the not-so-distant future, and that he will require dialysis once he reaches that stage, his kidneys are still operational as of today (albeit only at about 15-29 percent).").  Despite that an evaluation for a kidney transplant ordinarily should occur when an individual's GFR drops below 20 ml/min, see FOF ¶ 62, at 13, Burke, ████████████████████████, cannot be evaluated for a transplant while incarcerated, see FOF ¶ 55, at 12.  See United States v. Jackson, No. CR 14-0576, 2020 WL 1955402, at *2 (S.D. Tex. April 23, 2020)(Ellison, J.)(concluding that the defendant's "inability to receive a medically necessary kidney transplant in prison" constitutes an extraordinary and

compelling reason meriting his release). Burke's ██████████████████████████

████████████████████████  See FOF ¶ 108, at 21; United States v. Saldana, No. 20-

14632, 2022 WL 3971888, at *1 (11th Cir. September 1, 2022)(affirming the district court's

conclusion that "end-stage kidney disease requiring dialysis treatment . . . was an extraordinary

and compelling reason for compassionate release").

      Furthermore, Burke's ████████, which constitutes end-stage organ failure, is a terminal

illness. See FOF ¶ 68, at 15. The Sentencing Guidelines set forth that an extraordinary and

compelling reason may include a defendant's medical circumstances. See U.S.S.G.

§ 1B1.13(b)(1). Circumstances that may be relevant include that "[t]he defendant is suffering from

a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory)," such as "end-

stage organ disease." U.S.S.G. § 1B1.13(b)(1)(A). Courts routinely find "end-stage renal

disease," like Burke's ████████, qualifies as end-stage organ disease in the Sentencing

Guidelines § 1B1.13 policy statement. See United States v. Iezzi, No. CR 17-0157, 2021 WL

5832767, at *5 (W.D. Pa. December 9, 2021)(Hornak, C.J.)("As previously noted, many courts

have found that end-stage kidney failure rises to the 'extraordinary and compelling' level because

it falls into the category of 'end-stage organ disease' which is enumerated in the Application Note."

(quoting U.S.S.G. § 1B1.13(b)(1)(A))); United States v. Hickson, No. CR 13-0024, 2021 WL

1687317, at *4 (M.D. Ga. April 29, 2021)(Hyles, M.J.)(collecting cases and finding end-stage

renal disease qualifies as "end-stage organ disease"), report and recommendation adopted, 2021

WL 2697535 (M.D. Ga. June 30, 2021). Although a "specific prognosis of life expectancy (i.e., a

probability of death within a specific time period) is not required" to prove that an illness is

"terminal," U.S.S.G. § 1B1.13(b)(1)(A), Burke possesses such a prognosis: ████████

████████████████████████████████████████████████████████

████████, see FOF ¶ 67, at 14;  United States v. Washington, No. CR 20-10028, 2024 WL 864353, at *3 (D. Kan. February 29, 2024)(Melgren, C.J.)("§ 1B1.13(b) states that a "specific prognosis of life expectancy" is not required to demonstrate an extraordinary or compelling reason under § 1B1.13(b)").  Even absent reference to the Guidelines, courts often conclude that having a terminal illness is extraordinary and compelling.  See, e.g., United States v. Mumford, 544 F. Supp. 3d 615, 617 (E.D. Va. 2021)(Smith, J.)(concluding that "the Defendant has shown extraordinary and compelling reasons," because his "end-stage renal disease" is a "'terminal illness with an end-of-life trajectory" (quoting the record));  United States v. McCloy, No. CR 17-0083, 2024 WL 1489450, at *2 (D. Utah April 5, 2024)(Nuffer, J.)("Defendant's liver disease is a terminal illness.").

While some courts previously have suggested that the fact the sentencing court knew about the defendant's progressive illness at the time of sentencing weighs against finding extraordinary and compelling reasons, see, e.g., United States v. Ramos, No. CR 93-0360, 2020 WL 7488908, at *2 (E.D.N.Y. December 21, 2020)(Garaufis, J.)("The progression of Ms. Ramos's disease was anticipated by the medical evidence at the time the court imposed her sentence . . . ."), the Sentencing Commission subsequently has clarified that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment," U.S.S.G. § 1B1.13(e).  The policy statement further explains that "the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement." U.S.S.G. § 1B1.13(e).  See United States v. McCloy, No. CR 17-0083, 2024 WL 1489450, at *2

(D. Utah Apr. 5, 2024)(Nuffer, J.)("Defendant's medical conditions were known at the time of his sentencing.  However, the USSC's applicable policy statement provides that 'an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment.'" (quoting U.S.S.G. § 1B1.13(e)).  Here, therefore, the fact that the Court was aware of Burke's ██████████████████████████████ <u>see</u> FOF ¶ 39, at 9, does not preclude the Court from considering now his ██████ which has progressed substantially since sentencing, an extraordinary and compelling reason.

In addition, the § 1B1.13 policy statement provides further guidance for concluding that Burke's medical conditions are extraordinary and compelling reasons meriting a reduction in his sentence.  Section 1B1.13 provides that even non-terminal illnesses may constitute extraordinary and compelling reasons if "a defendant is . . . suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13(b)(1)(B)(i).  Burke's ██████████, which is terminal, and his ████████████, which is manageable but uncurable, <u>see</u> <u>Just Diagnosed with Type 1 Diabetes</u>, Ctrs. for Disease Control & Prevention, www.cdc.gov/diabetes/basics/diabetes-type-1-diagnosis.html, are serious medical conditions from which Burke "is not expected to recover." U.S.S.G. § 1B1.13(b)(1)(B)(i). <u>See</u> <u>United States v. Iezzi</u>, 2020 WL 4726582, at *7 ("[T]here is no doubt that Mr. Iezzi is suffering from a serious medical condition from which he is not expected to recover: severe stage IV kidney disease."); <u>United States v. Hickson</u>, No. CR 13-0024, 2021 WL 1687317, *4 (M.D. Ga. April 29, 2021)(Hyles, M.J.)(concluding that the defendant's Stage 5 CKD qualifies as a "serious medical

condition" under the § 1B1.13 policy statement), <u>report and recommendation adopted</u>, 2021 WL 2697535 (M.D. Ga. June 30, 2021).

Self-care for an individual, like Burke, suffering from ███████████████████ ██████, requires ███████████████████████████████ ████████████████ <u>See</u> FOF ¶¶ 72-92, at 15-19.  Burke's ability "to provide self-care," U.S.S.G. § 1B1.13(b)(1)(B)(i), by consistently taking each of these crucial measures has been curtailed as a result of his incarceration, <u>see</u> FOF ¶¶ 77-80, 85-86, 90, at 16-19; <u>United States v. Little</u>, No. CR 18-60013, 2020 WL 5902484, *3 (S.D. Fla. September 4, 2020)(Cohn, J.)(concluding that, because restrictions on "inmate movement within the facility" made it difficult for a diabetic inmate to "treat his [diabetes] with regular exercise," the inmate could not provide adequate self-care).  That Burke ████████████████████████████████ ████████████ suggests that Burke may not be able to provide appropriate self-care for his dangerous and progressive conditions.  <u>See</u> FOF ¶ 91, at 19; <u>United States v. Skrine</u>, No. CR 15-0160, 2021 WL 71233, *4 (W.D. Pa. January 8, 2021)(Hornak, J.)(concluding that a diabetic defendant who "was found unconscious . . . on more than one occasion . . . suffers from a . . . condition that substantially diminishes his ability to provide self-care within the correctional environment").  Finally, Burke's inability to provide self-care is uniquely detrimental to Burke, ████████████████████████████████████████████████████ ████████████████████████████  <u>See</u> FOF ¶ 92, at 19.  For these reasons, Burke's circumstances satisfy § 1B1.13's basis for finding extraordinary and compelling reasons resulting from a defendant's medical conditions, because Burke's conditions substantially diminish his ability to provide self-care while incarcerated. <u>See</u> <u>United States v. Perry</u>, 473 F. Supp. 3d 1250,

1253 (D. Colo. 2020)(Brimmer, C.J.)("The government concedes that Mr. Perry's type II diabetes is a 'serious . . . medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.'").

In conclusion, the compounded and progressive nature of Burke's ailments substantially and materially differentiate his situation from others inmates.  Considering the totality of Burke's medical circumstances, which include a terminal illness and prevent Burke from providing himself with adequate self-care while incarcerated, the Court concludes that extraordinary and compelling reasons warrant Burke receiving compassionate release.

## II.   A REDUCTION IN BURKE'S SENTENCE IS CONSISTANT WITH THE U.S.S.G. § 1B1.13 POLICY STATEMENT.

At the second step of the statutory compassionate release test, the court must find whether such a reduction is consistent with applicable policy statements that the Sentencing Commission has issued.  See McGee, 992 F.3d at 1042.  As discussed in Section I, supra, at 51-54, a reduction in Burke's sentence is consistent with the U.S.S.G. § 1B1.13 policy statement, insofar as his medical circumstances align with the situations wherein § 1B1.13 advises that extraordinary and compelling circumstances may be found, because Burke is suffering from a terminal illness, see U.S.S.G. § 1B1.13(b)(1)(A), and his medical conditions prevent him from providing adequate self-care in the prison environment, see U.S.S.G. § 1B1.13(b)(1)(B).   In addition, however, to be consistent with § 1B1.13, the defendant must not be "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."   U.S.S.G. § 1B1.13(a)(2).  See United States v. Gamboa, 467 F. Supp. 3d 1092, 1102 (D.N.M. 2020)(Parker, J.)("Before reducing or

modifying a defendant's sentence, a court must consider whether a defendant is dangerous to the community.").  Factors a court must take into account in determining whether a defendant is dangerous are: (i) the nature and circumstances of the defendant's offense; (ii) the weight of the evidence against the person; (iii) the defendant's character, including whether the individual was under a criminal sentence when he or she committed the underlying offense; and (iv) the nature and seriousness of the danger that would be posed if the defendant were to be released.  See 18 U.S.C. § 3142(g)(1)-(4).  On balance, despite the gravity of Burke's crime and his drug-related criminal history, the § 3142(g) factors indicate that Burke is not a threat to his community.

First, Burke's offense, distributing methamphetamine, is a serious crime.  See United States v. Cotinola, 487 F. Supp. 3d 1132, 1137 (D.N.M. 2020)(Vázquez)("The offense in this case was undoubtedly serious: by distributing large amounts of methamphetamine in the Albuquerque area, Mr. Cotinola contributed to the devastating harm drugs have wrought on our community.").  Moreover, Burke's offense involves "a controlled substance," and, on one occasion, Burke was apprehended in possession of a firearm.  18 U.S.C. § 3142(g)(1).  See FOF ¶¶ 14-15, 33, at 5, 8.  Nonetheless, the "offense charged" is not "a crime of violence," 18 U.S.C. § 3142(g)(1); see United States v. Garcia Nava, No. CR 19-2034, 2024 WL 221439, at *5 (S.D. Cal. January 19, 2024)(Curiel, J.)("The underlying crime was non-violent . . . ."), and there is no indication that Burke has ever used a firearm in connection with any of his criminal offenses, see United States v. Rodriguez, 451 F. Supp. 3d 392, 406 (E.D. Pa. 2020)(Brody, J.)("While he pleaded guilty to possessing a firearm in furtherance of a drug offense, there was no evidence that he used the gun during the drug transactions or at any other time.").  Cf. United States v. Solarin, No. 22-1052, 2022 WL 17849056, at *1 (10th Cir. December 22, 2022)("[T]he underlying crime here was a

violent bank robbery in which he brandished a gun at multiple people and threatened to kill

them . . . .").   Second, at Burke's sentencing hearing, the United States acknowledged that the

evidence against Burke was weak, because "the officers on the ground . . . didn't necessarily

follow the play book . . . ."  FOF ¶ 41, at 9 (quoting Sentencing Tr. at 9:15-10:14 (Matthews)).

The United States explained that it agreed to a variance in Burke's sentence, in part because there

was a risk that Burke would succeed on his motion to suppress.  See FOF ¶ 41, at 9.  "[T]he weight

of evidence against" Burke, therefore, is not great.  18 U.S.C. § 3142(g)(2).  See United States v.

Gonzales, No. CR 12-0128, 2013 WL 312884, at *15 (D.N.M. January 17, 2013)(Browning,

J.)("[T]he weight against Rodriguez does not appear substantial and weighs in favor of finding

him fit for pretrial release.").

Third, Burke's history and his characteristics weigh in favor of finding that he does not

pose a danger to the community.  See 18 U.S.C. § 3142(g)(3).  Despite that Burke has a lengthy

criminal history, cf. United States v. Gamboa, 467 F. Supp. 3d at 1102 (concluding that the

defendant was not dangerous where, "[p]rior to the instant offense, Defendant had no criminal

history"), Burke's prior convictions are all for non-violent drug possession, primarily of marijuana

and methamphetamine, see FOF ¶¶ 1-8, at 2-4; United States v. Mitchell, 472 F. Supp. 3d 403,

408 (E.D. Mich. 2020)(Berg, J.)("Although Mitchell has a significant criminal history, it

is . . . predominantly nonviolent . . . .").   Burke's largely non-violent criminal history stands in

contrast to the violent criminal histories of many defendants whom the Court has determined to be

a danger to the community.   See, e.g., United States v. Thompson, 2024 WL 1557126, at *21.

Despite Burke's "history relating to drug or alcohol abuse," he has strong "family ties" in Grants

that will be able to provide him with support upon his release, 18 U.S.C. § 3142(g)(3)(A); see

FOF ¶¶ 96-99, at 20, and, "at the time of the current offense or arrest," Burke was not "on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law," 18 U.S.C. § 3142(g)(3)(B); see FOF ¶ 32, at 7. Cf. United States v. Solarin, 2022 WL 17849056, at *1 ("The court explained he had been on probation for aggravated robbery when he committed the underlying offenses in this case . . . .").

Finally, under the fourth § 3142(g) factor, the Court must evaluate "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). Under this factor, the "[s]afety to the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community." United States v. Kroeker, No. 22-3092, 2022 WL 2610344, at *4 (10th Cir. July 8, 2022). Here, the risk that Burke will engage in criminal activity upon release is lessened by the fact that his medical conditions have progressed significantly since he committed his offense, see United States v. Cotinola, 487 F. Supp. 3d at 1137 ("Given Mr. Cotinola's poor health and his dependence on dialysis in particular, the Court does not believe that he poses a threat to public safety."); cf. United States v. Wright, 46 F.4th 938, 951 (9th Cir. 2022)(refusing to reduce the defendant's "sentence to time served and impose home detention" where the defendant "had committed his crime while he 'was already [disabled]'" (quoting the district court below)), and because Burke will be confined to his parents' home upon release, see United States v. Cotinola, 487 F. Supp. 3d at 1137 ("The Court also notes that he will be in home detention with location monitoring upon release from the BOP and will be under the supervision of probation during the duration of his term of supervised release."). In addition, in considering "the nature and seriousness of the danger to any

person," the court carefully has considered what it regards as the most troubling incident in Burke's past, which occurred when Burke was arrested for Aggravated Battery Against a Household Member after A.S. informed officers that Burke had grabbed her by the throat and began to choke her. 18 U.S.C. § 3142(g)(4). See FOF ¶¶ 12-13, at 4. While Burke's conduct in this case concerns the Court, Cibola County prosecutors determined not to prosecute Burke on this occasion, see FOF ¶ 9, at 4, and Burke has maintained, following the incident, a "very stable" relationship with his partner, FOF ¶ 104, at 21. In addition, Burke speaks to his partner and the son they have together "on a daily basis." FOF ¶ 104, at 21. In addition, should Burke be released, he would not be living with his partner as was the case when Burke committed the federal drug offense. FOF ¶¶ 96, 98, at 20. See United States v. Cotinola, 487 F. Supp. 3d at 1137 (concluding that the defendant did not pose a danger to the safety of any person or the community despite that the court was "disturbed by the acts of violence he committed against several women in his life"). Accordingly, the Court concludes that Burke's compassionate release will not pose a "danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). The Court therefore concludes that a reduction in Burke's sentence is consistent with the § 1B1.13 policy statement.

## III.   A REDUCTION IN BURKE'S SENTENCE DOES NOT ALIGN WITH THE 18 U.S.C. § 3553(a) SENTENCING FACTORS.

Having concluded that extraordinary and compelling reasons exist that may warrant a reduction of sentence that are consistent with applicable Sentencing Commission policy statements, the Court next must consider the factors in § 3553(a), to the extent that they are applicable, to determine whether a reduction is warranted. See McGee, 992 F.3d at 1042. Even

where defendants establish extraordinary and compelling reasons warranting their release that are consistent with applicable policy statements, the Court's consideration of the § 3553(a) factors may serve as an independent bar to the reduction of a defendant's sentence.  See United States v. Wirichaga-Landavazo, No. 23-4040, 2023 WL 7166173, at *4 (10th Cir. October 31, 2023)("[E]ven if Wirichaga-Landavazo had presented extraordinary and compelling reasons for a sentence reduction, the district court did not abuse its discretion in denying Wirichaga-Landavazo's compassionate release motion based on the § 3553(a) factors.").  Section 3553(a) "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing."  Kimbrough v. United States, 552 U.S. 85, 101 (2007)(quoting 18 U.S.C. § 3553(a)).  These goals include:

> the need for the sentence imposed --
>
> > (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B)     to afford adequate deterrence to criminal conduct;
> >
> > (C)     to protect the public from further crimes of the defendant; and
> >
> > (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).  The other applicable sentencing factors that the Court must consider are: (i) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (ii) "the kinds of sentences available"; (iii) "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category

of defendant as set forth in the guidelines"; (iv) "any pertinent policy statement"; (v) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and (vi) "the need to provide restitution to any victims of the offense."   18 U.S.C. § 3553(a)(1), (3)-(7).   Courts may apply the § 3553(a) factors both to a defendant's pre-sentencing conduct and to his or her conduct while incarcerated.   See United States v. Wesley, 60 F.4th 1277, 1286 (10th Cir. 2023), cert. denied, No. 23-6384, 2024 WL 2883879 (U.S. June 10, 2024).   The Court concludes that the applicable § 3553(a) factors do not warrant a reduction in Burke's sentence.   Accordingly, the Court denies the Motion.

First, "the nature and circumstances of the offense and the history and characteristics of" Burke weigh against reducing Burke's sentence.   18 U.S.C. § 3553(a)(1).   The nature and circumstances of Burke's offense, involving the possession with the intent to distribute over five grams of methamphetamine, weighs against his release.   See United States v. Greene, 847 F. App'x 334, 337 (6th Cir. 2021)("Greene's conduct of conspiring to distribute heroin and carfentanil is highly dangerous criminal conduct . . . ."); United States v. Quail, No. CR 18-3156, 2022 WL 3448634, at *4 (E.D. Pa. August 17, 2022)(Pratter, J.)("Turning to Mr. Quail's argument that his crimes were non-violent and minor relative to others, that is also not a reason to grant compassionate release."); United States v. Ruiz, 507 F. Supp. 3d 907, 910 (N.D. Ohio 2020)(Carr, J.)("Mr. Ruiz was responsible for injecting massive quantities of cocaine and heroin into the Toledo, Ohio community. The seriousness of Mr. Ruiz's offense weighs heavily against granting the relief he requests.").   The continued challenges New Mexico faces when it comes to methamphetamine use underscores the seriousness of Burke's offense.   See, e.g., Department of Health Reports Methamphetamine Overdose Death in New Mexico Increase, New Mexico

Department of Health (September 4, 2019), available at www.nmhealth.org/news/information/2019/9/?view=792.  Burke played a large role in the drug distribution taking place the small town of Grants.  The Mexican cartels and other groups' distribution of drugs in this nation is extensive, rivaling Walmart and Amazon's distribution systems, and it is dependent on people like Burke who take care of the drug needs of small American towns.  That Burke played this role weighs against his release.

In addition, Burke has an extensive criminal history.  See FOF ¶¶ 1-17, at 2-5; United States v. Greene, 847 F. App'x at 337 (concluding that the defendant's "extensive criminal history supports the district court's determination," where the defendant has "three previous drug-trafficking convictions" and "'began selling drugs only three months after being released from prison on [his] last drug trafficking offense'" (quoting the record)); United States v. Ruiz, 507 F. Supp. 3d at 910 ("Although he does not have a violent history, he does have a history of trafficking drugs."); United States v. Serrano, No. CR 13-4004, 2020 WL 3869475, at *2 (D.N.M. July 9, 2020)(Brack, J.)("The Court agrees that Mr. Serrano's extensive criminal history counsels against compassionate release.").  Indeed, when he was sentenced, Burke's Criminal History Category was a V, the second highest possible category.  See FOF ¶ 34, at 8.  Burke has previously had poor outcomes on supervised release for his State convictions.  See FOF ¶¶ 16-17, at 5.  Moreover, on one occasion, Burke was apprehended with an AR15 assault rifle, and Burke has been arrested for Aggravated Battery Against a Household Member.  See FOF ¶¶ 12-15, 4-5.  See United States v. Ocampo, 650 F. Supp. 3d 578, 585 (E.D. Mich.)(concluding that the defendant's "history and characteristics affirm the accuracy of his original sentence," where the defendant was convicted of non-violent drug trafficking and a firearm was found in "his storage unit"), reconsideration denied,

655 F. Supp. 3d 622 (E.D. Mich. 2023).  Although the Court concludes that these two instances do not mean that Burke presents a danger to the safety of another person or to his community for the purposes of U.S.S.G. § 1B1.13(2), see Section II, supra, at 55-59, they indicate the seriousness of Burke's criminal history and characteristics.  In sum, the § 3553(a)(1) weighs against granting Burke's motion for compassionate release.

The second factor is the need for the sentence imposed to serve the enumerated purposes of punishment.  See 18 U.S.C. § 3553(a)(2).  The Court must "impose a sentence sufficient, but not greater than necessary, to comply with [these] purposes."  18 U.S.C. § 3553(a).  As discussed, Burke's drug trafficking activities are serious and will have "lasting and detrimental effects within his own community," and thus the Court concludes that it is necessary for Burke to serve his full sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment.  United States v. Ruiz, 507 F. Supp. 3d at 911.  See 18 U.S.C. § 3553(a)(2)(A).  Regarding the need to afford adequate deterrence to criminal conduct and protect the public from further crimes the defendant may commit, Burke, "though not a violent individual, is nevertheless a repeat offender."  United States v. Ruiz, 507 F. Supp. 3d at 911.  See 18 U.S.C. § 3553(a)(2)(B)-(C).  Finally, Burke is currently receiving "needed . . . medical care" for his serious medical conditions, ███████████████████████ at MCFP Springfield.  18 U.S.C. § 3553(a)(2)(D).  See FOF ¶¶ 106-08, at 21.  For these reasons, § 3553(a)(2) counsels against Burke's release.

Third, "the kinds of sentences available," and "the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines issued by the Sentencing Commission . . . subject to any amendments made to such guidelines," weigh against reducing Burke's sentence.  18 U.S.C.

§ 3553(a)(3)-(4).   Burke's sentence of 60 months, see FOF ¶ 43, at 9, is substantially below Burke's Guideline imprisonment range, which is 168-210 months, see FOF ¶ 34, at 8 (citing PSR ¶ 82, at 21); United States v. Gonzales, 547 F. Supp. 3d at 1139 ("[B]ecause Gonzales already received a sentence which could have been much higher, § 3553(a)(3)-(4) do not support any reduction on Gonzales' sentence.").   Moreover, the 60 months that Burke received is the statutory minimum for a violation of 21 U.S.C. § 841(a) involving 5 grams or more of methamphetamine. See FOF ¶ 36, at 8; 21 U.S.C. § 841(b)(1)(B) ("[S]uch person shall be sentenced to a term of imprisonment which may not be less than 5 years . . . .").   Although the Tenth Circuit has advised that Courts may reduce a sentence below the mandatory minimum pursuant to a motion for compassionate release, see United States v. Eccleston, 543 F. Supp. 3d at 1136 n.20 ("[T]he Tenth Circuit finds in the words 'extraordinary and compelling' the ability of district courts to get rid of mandatory minimums."), the Court is reluctant to give Burke a massive variance down to the mandatory minimum at sentencing and then, on a post-sentence motion for compassionate release, go below the mandatory minimum.   To do so seems close to disregarding Congress' will.   See United States v. Eccleston, 543 F. Supp. 3d at 1136 n.20 ("Respectfully, the Court doubts that . . . district courts have the authority to . . . ignore mandatory minimums." (citing United States v. Tomes, 990 F.3d 500, 505 (6th Cir. 2021));   United States v. Andrews, 480 F. Supp. 3d 669, 678-79 (E.D. Pa. 2020)(Robreno, J.)(reasoning that granting compassionate release based on the length of the defendant's sentence where "mandatory minimums are involved," "would infringe on the legislature's province to fix penalties"), aff'd, 12 F.4th 255 (3d Cir. 2021).   Just

because the Court may have the power to go below the mandatory minimum does not mean that disregarding the mandatory minimum is a good public policy idea.[7]

Section 3553(a)(5) requires the Court to "consider . . . any pertinent policy statement" in determining a sentence. 18 U.S.C. § 3553(a)(5). For the reasons discussed in detail in Section I, supra, at 51-54, Burke's medical conditions are consistent with the applicable U.S.S.G § 1B.13 policy statement. Beyond § 1B.13, the Court finds no additional Sentencing Commission policy statements, and Burke presents none, that apply to this case. Section 3553(a)(5), therefore, weighs in favor of a sentence reduction. The Court concludes that the sixth factor, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), weighs against Burke's release. Although Burke's co-defendant, Sergio Carballo, received a sentence of "25 months 11 days," Judgment in a Criminal Case at 2, filed May 2, 2024 (Doc. 167), Carballo pled guilty to a less serious offense, see United States v. Brown, 457 F. Supp. 3d at 704 ("Defendant's codefendant was released two years ago and, aside from the § 924(c) counts, engaged in similar conduct."). Specifically, Carballo, unlike Burke, pled to a crime that did not subject him to a mandatory minimum sentence, compare Plea Agreement ¶ 4(a), at 2 (advising that Burke "understands that the minimum . . . penalt[y] provided by law for this offense [is] imprisonment for a period of not less than 5 years"), with Plea Agreement ¶ 4(a), at 2, filed November 14, 2023 (Doc. 148)(providing that Carballo faces no mandatory minimum for the offense to which he pleads guilty), and,

---

[7]At the April 10, 2024, hearing, the United States admitted that it had not "fully grappled with" the issue of varying below the statutory mandatory minimum pursuant to a compassionate release motion and explained that the Court's concerns whether it is sound policy to sentence below the mandatory minimum was "fair." Motion Hearing Tr. at 30:11-31:23 (Court, Mattei).

moreover, Carballo had a lower criminal history score and criminal history category than Burke, compare United States v. Carballo, Presentence Investigation Report at ¶¶ 58-59, at 17, filed January 16, 2024 (Doc. 150)(stating that Carballo's criminal history score is 4 establishing a criminal history category of III), with PSR ¶¶ 49-50, at 13 (calculating that Burke's criminal history score was 10 establishing a criminal history category of V).  For these reasons, Carballo's comparatively lower sentence does not provide strong support for bending the sixth sentencing factor in Burke's favor.  Finally, the Court did not order Burke to pay any restitution, so § 3553(a)(7) is a neutral factor.  See Judgment at 3, 7.

    In sum, having concluded that all but one of the sentencing factors set forth in 18 U.S.C. § 3553(a) weigh against Burke's release, the Court concludes that compassionate release is not appropriate in this case.  A reduced sentence would undermine the goals of Burke's original sentence and of § 3553(a).  The reduction authorized by Burke's extraordinary and compelling circumstances, therefore, is not warranted under the particular circumstances of this case.  See McGee, 992 F.3d at 1042.  Accordingly, the Court denies Burke's motion for compassionate release.

    **IT IS ORDERED** that the Unopposed Motion for Compassionate Release, filed February 23, 2024 (Doc. 157), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Alexander M. M. Uballez

- 66 -

United States Attorney
Louis C. Mattei
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Erlinda O. Johnson
Adrian Gandara
Law Office of Erlinda Johnson
Albuquerque, New Mexico

-- and --

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

-- and --

Elana R. Fogel, Director, Criminal Defense Clinic
Duke University School of Law
Durham, North Carolina

*Attorneys for the Defendant*